## SHEEHAN v. ST. PAUL & D. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. October 16, 1896.)

### No. 293.

**1. INJURIES BY TRAIN—TRESPASSERS.**

A railroad company is not bound to any act or service in anticipation of trespassers on its track, nor is the engineer obliged to look out for them; and a trespasser venturing upon the track for purposes of his own assumes all risk of conditions which may be found there, including the operation of engines and cars.

**2. SAME.**

Plaintiff, injured while caught in a cattle guard, testified that the engineer looked at him when the engine was 500 feet away, while he was shouting and motioning with his hands; but on cross-examination he admitted the truth of a statement made by him the day after the accident that, when the engine was three or four car lengths away, he shouted and waved his handkerchief, but could not attract the engineer's attention. Two of plaintiff's witnesses testified that they heard plaintiff's cries when the engine was 200 feet or less away from him, while the trainmen testified that the engine was only 150 feet away when plaintiff cried out. Plaintiff's witnesses estimated the speed of the train at 3 miles per hour, and defendant's witnesses at 4 to 5 miles; and plaintiff's expert testified that a train moving 3 miles an hour would, on an average, be stopped in 100 feet, while defendant's three experts stated that 190 to 200 feet would be required in the case of an engine going 4 miles an hour. *Held,* that the engineer, fireman, and brakeman having testified that every means was used to stop on hearing plaintiff's cries, and that the engine could not be stopped in time owing to the slippery state of the rails and other existing conditions, it was proper to direct a verdict for defendant.

In Error to the Circuit Court of the United States for the Western District of Wisconsin.

The plaintiff was injured by a locomotive which was operated by an engineer of the defendant, and ran over and severed the plaintiff's foot, while caught in an iron cattle guard, in the track of the defendant's railroad, in the village of Carlton, Minn. He was attempting to walk in a place and under conditions wherein it was ruled by the trial court that he was clearly a "trespasser on the track," and the record states that "the plaintiff takes no exception to such rule." The injury occurred at about 2:30 p. m., October 30, 1894, in the operation of switching to make up a train, when the locomotive was moving backward, pulling 16 empty flat cars, on a down grade of four-tenths per cent., on a track which was wet and slippery, after a slight fall of snow; the rate of speed being stated by the trainmen at 4 to 5 miles per hour, and by witnesses on behalf of the plaintiff at about 3 miles. The cattle guard in which the plaintiff became entangled was about 1,000 feet east of the depot, in the main track, which was practically a straight line between those points. Intermediate there were several side and switch tracks, with six switches, and a village street (North Fourth street) crossed the tracks at right angles 315 feet west of the cattle guard. Two of the switches were between the cattle guard and this street,—one 61 feet west of the cattle guard, leading to a branch railroad to Cloquet, over which the train in question was going; and the other 161.3 feet west of that, or 222.3 feet west of the cattle guard. The other four switches were distributed within a space 20 to 270 feet west of this street, the switch for side track No. 1 being 435 feet west of the cattle guard. For making up the train in question, it was necessary to run the locomotive over and beyond the cattle guard. The testimony of the engineer is undisputed that he had run up over the cattle guard with two coaches, about two or three minutes before the accident, in switching the coaches to the main track; that, leaving the coaches there, he returned east to within

four or five car lengths of the cattle guard, and switched over to track No. 1, there taking up 16 flat cars which he was pulling out over the main track, to couple on the coaches, and make up his train, when the accident occurred. The brakeman left the train to set the switches, and the engineer was watching his movements and signals. The fireman was on the engine, but putting in coal immediately before the alarm. The conductor was at the depot platform, taking the car numbers. The engineer and fireman both testify that they neither saw nor heard the plaintiff until within three or four car lengths of him; that immediately the engineer "reversed the engine, gave her sand and all the steam that she had, and set the air brake on the tender" (there being no air brake on the engine), but all their efforts were insufficient to prevent the catastrophe, the engine running its length beyond the plaintiff. Aside from the plaintiff, two witnesses, who testify in his behalf, were in the vicinity, Frank J. Ellis and Esther Weilander. The former, a sign painter, was standing on the north side of the track, about 10 feet east of the street crossing, and "heard a man yelling and motioning with his hands." He was "motioning with both of his hands stretched upward and facing westward, motioning towards the engine." The position of the locomotive at that moment is described by him as east of the street crossing "about 100 feet, 110 feet, 125 feet, may be; I do not know exactly," and "about one-third of the ways of the distance" between this street and the man; and it was moving east, pulling the train. He did not give further attention; "did not know the man was caught in the cattle guard," or of the accident until afterwards. Esther Weilander was 19 years of age, and at the time of the accident was on the south side of the main track, between that and a switch track, apparently about halfway between the street and the cattle guard, going from a store on the south side to her home on the north side of the railroad. She says: "I did not see anybody near the cattle guard when I came down from the store, but did right after. I did not see him before he commenced to call. I was not paying very much attention to it. I saw the train before I saw anybody down there. After that I saw the man in the cattle guard. He was trying to escape from the cattle guard. * * * When I first saw the man in the cattle guard, the train was a little this side of the first switch west of me. The front part of the engine was near the switch. It had not wholly passed that switch. Part of the engine was at the switch." On cross-examination, she thought the locomotive "was about halfway" between the street and the cattle guard, when she first heard the man shouting, but "not quite that far." She also says the engine "slowed off."

The plaintiff testified that he was a stranger in Carlton, arriving there early in the morning on the day of the accident, seeking "work in the woods"; that soon after noon he went down the tracks, with three others, who "were cooking some dinner"; that one of them gave him 50 cents to purchase tobacco and alcohol in the village, and he "started to walk up the track," came to the cattle guard, his foot slipped, and caught between the rail and the guard. He then says: "I tried to get it out, and could not do it. I looked around after it had gone down, and didn't see nothing. I was trying to get it out without hurting myself, and could not do it. I had all the skin off my ankle here, and I could not get out. I put down my hand to untie the shoe, and I could not put my hand down further than the lacing on my shoe; and I got my finger down, and tried to loose it. I seen the train at the depot steaming, and I didn't know what way she was coming, and then I saw her coming towards me. I commenced hollering. I didn't know what track she was on. * * * She came along down, and I seen the engineer, and I seen his head and shoulders, looking towards the depot, and then this way, the same as just as if he heard hollering." He states, further, that the engineer was looking towards where he was, and that plaintiff was then "making motions with his hands and hollering"; that "then about halfways I was hollering"; that he saw the engineer looking that way when a "little ways from the depot," and then "about halfways between where I was caught and the depot I saw him turn around and look at me"; that plaintiff was "hollering, making motions with his hands, and jerking his leg; at the same time the engineer turned and looked at him"; and, when the engine was about six car lengths from him, he pulled out his "big red handkerchief, and waved it."

On cross-examination, a statement purporting to have been made by the plaintiff to an agent of the defendant, and written by the latter, on the day after the accident, was read to the plaintiff. It states after the preliminary recitals: "I thought I could withdraw my shoe, but could not. I then tried to undo shoe lacing, and failed. I saw an engine, with a long string of cars, coming towards me; and, when engine was about three car lengths from me, I shouted at engineer, but could not attract his attention. I then tried it by waving a red pocket handkerchief, and this, too, failed." With the exception that it should have read "three or four car lengths," the plaintiff finally answered that this was a true statement. His counsel subsequently inquired, "Did you holler before that time?" and he answered, "Yes, sir." Testimony introduced for the defense tended to show that plaintiff was intoxicated, but this is denied by him. He says he "had two drinks of whisky." The engine was a light Baldwin, "used to run both ways, and had a pilot on each end"; but, running rearward, the sand could not have full effect for checking on a slippery track, as it could be applied only to one pair of drivers. The engineer had served as such 20 years, and his run was on the branch between Carlton and Cloquet. A witness on behalf of plaintiff, who "had run an engine for nearly three years," on freight trains, testified as an expert that a train, under the conditions stated, running three miles an hour, ought to be stopped in 100 feet; that "would be a good fair average," a "good ordinary stop"; but he further stated that engines and conditions varied so that no cast-iron rule could be laid down, and a speed of four or five miles would increase the distance required for stopping. Three experts on the part of defendant, each of long experience, state the distance required for stopping, assuming a speed of four miles an hour, at 190 to 200 feet.

At the close of the testimony, on motion of the defendant, the court instructed the jury to render a verdict for the defendant, stating as the ground that, "upon the undisputed facts of the case, this injury did not occur through any wrongful action upon the part of the defendant"; and the fact is mentioned that in a previous trial verdict had been rendered for the plaintiff, and the district judge, then presiding, had felt compelled to set the verdict aside.

T. M. Thorson, for plaintiff in error.

Emerson Hadley, for defendant in error.

Before WOODS and SHOWALTER, Circuit Judges, and SEAMAN, District Judge.

SEAMAN, District Judge, after stating the case as above, delivered the opinion of the court.

If there is evidence in this record which would sustain a verdict that the injury of the plaintiff was caused by a breach on the part of the defendant of a duty or obligation which it had incurred towards the plaintiff, it is clear that the question of its liability was for the jury to determine. Failing such evidence, it would become a question of law, to be withdrawn from the jury by directing a verdict. Even if the evidence is "clearly preponderant" against negligence, or is "of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it," this responsibility may be pressed upon the court. Pacific Co. v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338; Railway Co. v. McDonald, 152 U. S. 262, 283, 14 Sup. Ct. 619, and cases cited.

The plaintiff, at the time of his injury, was neither in the relation of passenger, nor of one in a public crossing or place in which the public were licensed to travel, but, upon the undisputed facts, was

a mere intruder on the tracks of the defendant,—technically, a trespasser; and this record excludes any of the elements of implied license or invitation to such use which have given rise to much discussion and diversity of views in the courts. Therefore the inquiry is here squarely presented: What is the duty which a railway company owes to a trespasser on its tracks, and how and when does the duty arise? The decisions upon this subject uniformly recognize that the trespasser cannot be treated as an outlaw; and, at the least, that, if wantonly injured in the operation of the railroad, the company is answerable in damages. Clearly, then, an obligation is placed upon the company to exercise some degree of care when the danger becomes apparent. Is it, however, bound to foresee or assume that rational beings will thus enter as trespassers in a place of danger, and to exercise in the running of its trains the constant vigilance in view of that probability which is imposed for public crossings? There are cases which would seem to hold this strict requirement (see note 1, Thomp. Neg. 448; Railroad Co. v. St. John, 5 Sneed, 524); but by the great preponderance of authority, in this country, and in England, the more reasonable doctrine is pronounced, in effect, as follows: That the railroad company has the right to a free track in such places; that it is not bound to any act or service in anticipation of trespassers thereon; and that the trespasser who ventures to enter upon a track for any purpose of his own assumes all risks of the conditions which may be found there, including the operation of engines and cars. Wright v. Railroad Co., 129 Mass. 440; Railroad Co. v. Hummell, 44 Pa. St. 375. The decision by this court in Railway Co. v. Tartt, 24 U. S. App. 489, 12 C. C. A. 618, and 64 Fed. 823, adopts the view held in this line of cases, citing the authorities of which repetition here is unnecessary. The same doctrine prevails in Minnesota, where the injury in question arose. Johnson v. Truesdale, 46 Minn. 345, 48 N. W. 1136; Studley v. Railroad Co., 48 Minn. 249, 51 N. W. 115. In the latter case it was held that there could be no recovery "unless the engineer saw the girl in time to avoid the accident, and then was guilty of such gross negligence in not trying to avoid it as to evince a reckless disregard of human life"; and the opinion gives this further exposition of the rule:

"The defendant's engineer was under no obligation to anticipate a trespasser, or to look out for persons walking upon the track. But upon discovering plaintiff's intestate across the cattle guard, as he claims she was when he noticed that she was in danger, it became the engineer's duty to use proper care to avoid running her down. If he failed to exercise proper care, he would necessarily be grossly negligent, and evince a reckless disregard of human life." Studley v. Railroad Co., supra.

So, in Wisconsin in Anderson v. Railway Co., 87 Wis. 195, 204, 58 N. W. 79, 82, it is said:

"The use of a railroad is exclusively for its owners, or those acting under its authority; and the company is not bound to the exercise of any active duty of care or diligence towards mere trespassers on its track, to keep a lookout to discover or protect them from injury, except that, when discovered in a position of danger or peril, it is its duty to use all reasonable and proper effort to save and protect them from the probable consequences of their indiscretion or negligence."

The well-established and just rule which holds the railroad company to the exercise of constant and strict care against injury through its means is applicable only to the relation on which it is founded, of an existing duty or obligation. This active or positive duty arises in favor of the public at a street crossing or other place at which it is presumable that persons or teams may be met. It is not material, so far as concerns this inquiry, whether the place is one for which a lawful right of passage exists, as it is the fact of notice to the company, arising out of its existence and the probability of its use, which imposes the positive duty to exercise care; the requirement of an extreme degree of care being superadded because of the hazards which attend the operations of the company. The case of a trespasser on the track, in a place not open to travel, is clearly distinguishable in the absence of this notice to the company. There is no constructive notice upon which to base the obligation of constant lookout for his presence there, and no actual notice up to the moment the trainmen have discovered the fact of his peril. As that peril comes wholly from his unauthorized act and temerity, the risk, and all positive duty of care for his safety, rests with the trespasser. The obligation of the company and its operatives is not, then, pre-existing, but arises at the moment of discovery, and is negative in its nature,—a duty, which is common to human conduct, to make all reasonable effort to avert injury to others from means which can be controlled. This is the issue presented here. It excludes all inquiry respecting the character of the roadbed, cattle guard, locomotive, brake appliances, or other means of operation, or of the speed or manner of running the train up to the moment of notice, because no breach of positive duty is involved. It is confined to the evidence relating to the discovery by the engineer and fireman of the plaintiff's peril, and to the efforts then made to avert the injury, and, out of that, to ascertain whether, in any view which may justly be taken, it is shown that these men, or the engineer, in disregard of the duty which then confronted them, neglected to employ with reasonable promptness the means at hand for stopping the train. The contention on behalf of the plaintiff affirms this upon the following propositions, substantially: (1) That negligent delay is expressly shown by the plaintiff's personal testimony; and (2) that, laying aside the adverse testimony introduced by the defendant, the fact of such delay is clearly inferable from that on the part of the plaintiff, taken as a whole. Unless one or both of these claims are well-founded, the inquiry is readily solvable, as both presumption and affirmative proof are clearly with the defendant.

1. The plaintiff testifies, in effect, that he saw the train when it was near the depot, steaming towards him; that "a little ways from the depot the engineer seemed to be looking towards him"; "and then, about halfways between" where he was caught and the depot, he says, "I saw him turn around and look at me;" and "I was hollering, and making motions with my hands, jerking my leg; at the same time he turned around and looked at me." Notice cannot be imputed upon the fact alone that the engineer was in position to see the plaintiff on the track, but his presence must have been observed under circumstances which clearly impute knowledge of his helpless condition.

This may be shown by circumstantial evidence,—by the "presumptive inference from physical facts,"—which may overcome both the presumption against wrongdoing in the conduct of the trainmen, and their positive testimony that the plaintiff was not discovered until "the engine was within three or four car lengths of him." And upon these premises it is argued that the above version given by the plaintiff, standing alone, and under the conditions in which he was placed, is sufficient, without corroborating circumstances, to raise an issue which must be determined by the jury. To so affirm would, at least, call for the adoption of an extreme view regarding the province of the jury; but decision is not required upon the bald proposition, because it ignores other features of the testimony upon the same side, either conflicting or qualifying, to which just effect must be given, as follows: (1) On cross-examination the plaintiff admitted that he made a statement of the facts, on the day following the injury, in which he said: "I saw an engine with a long string of cars coming towards me, and, when engine was about three car lengths from me, I shouted at engineer, but could not attract his attention. I then tried it by waving a red pocket handkerchief, and this, too, failed." And he then testifies that this is true and correct, except that it should have read "three or four car lengths." Such statement, taken by a representative of the adverse party, is always open to explanation and suspicion, when tendered by way of admission against interest; but here it is distinctly adopted by the plaintiff, and made a part of his testimony. The statement contains no suggestion either that he was caught when the train was near the depot, or before it was within three or four car lengths of him, or that he gave any prior outcry or signal, or saw the engineer looking in his direction. It clearly differs from his narration as given on direct examination, and is either contradictory in those particulars, or makes uncertain whatever of seeming certainty there was in his direct testimony. (2) Two witnesses of the occurrence were produced by plaintiff, Frank J. Ellis and Esther Weilander. They were near the track, but upon opposite sides, the former about 300 feet, and the latter less than 200 feet, from the plaintiff. Both had the plaintiff in clear view, heard his outcry, and observed the approach of the train. Ellis says his attention was first called to the train by plaintiff's "yelling and motioning with his hands"; thinks the engine was then about 100 to 125 feet east of the street crossing, or within 200 feet of the plaintiff. He did not observe from his appearance or cry that plaintiff was caught, and therefore turned away, and did not witness the accident. Esther Weilander was crossing the tracks, in clear view of the cattle guard, but "did not see anybody" there, nor hear any cry, until after she noticed the approach of the train. Then she heard the plaintiff cry out, and noticed he "was caught, and was pulling his foot." Her location of the engine at the moment of this alarm is certain only in placing it within 200 feet or less of the plaintiff; and she says the engine "slowed off," but was not stopped before it struck the man. Both of these witnesses were in a position where they would have observed the plaintiff had he been caught in the cattle guard and making outcry previous to the moment of which they speak; and their

testimony repels any inference of earlier notice which might otherwise appear from the plaintiff's statement. They also forcibly tend to confirm both the testimony and the theory of the defense that the entry by the plaintiff upon the track, his entanglement in the cattle guard, and his outcry were all momentary, and all occurred when the engine was within 200 feet of him. It follows that the proposition of the sufficiency of proof in the testimony of the plaintiff to submit the case to the jury on the question of earlier notice is not well founded.

2. The second proposition is also untenable. In the estimates made by the bystanders of the distance at a given moment between a moving train and one who is in its pathway, with disaster impending, differences of judgment are probable, and no estimate can be regarded as certain. Their judgment under like circumstances of the exact rate of speed of the train is even more liable to be faulty. But this testimony is singularly free from essential difference respecting the distance of the engine from the plaintiff when he cried out, as the witnesses for plaintiff place the maximum at about 200 feet, while the trainmen state it at about 150 feet. The former estimate the speed of the train at 3 miles per hour, and the latter at 4 to 5 miles. With reference to the distance which a train may run before it can be stopped under conditions stated in this case, the testimony of experts was received; one produced by the plaintiff, and three by the defendant. As the issue involved no question of negligence for imperfect appliances, or their failure in accomplishment, this testimony can only be considered for the purpose of establishing presumptively that there was unreasonable delay in the attempt to stop. All of the experts agree in stating that the distance required is dependent upon numerous conditions, and varies widely; that no fixed rule could be given, nor distance stated with certainty; and that "engines are very queer," and some of the difficulties were inexplicable. Based upon a speed of 3 miles per hour and other conditions stated, the expert introduced for the plaintiff says 100 feet "would be a good fair average," and "a good ordinary stop." The others, assuming a rate of 4 miles, say that 190 to 200 feet would be required. If there could be a presumption of delay founded on the former, it would be overcome by the three opposing opinions. There is, therefore, no evidence disputing or weakening the force of that which is furnished by the engineer, fireman, and brakeman, that every means was applied, and their utmost effort made, immediately on hearing the cry; that the train could not be stopped in time because of conditions named, and particularly the slippery state of the rails, and the impossibility, with the engine running backward, of using sand on one pair of the drivers.

The court was clearly justified in directing a verdict for the defendant, and the judgment is affirmed.