## STELK v. McNULTA.

(Circuit Court of Appeals, Seventh Circuit. January 18, 1900.)

### No. 637.

1. APPEAL—RECORD—STIPULATION OF FACTS MADE SUBSEQUENT TO DECREE.

The duty of the circuit court of appeals on an appeal is confined to a review of the rulings and decree of the trial court, and a stipulation of facts made by the parties after the decree below is no part of the record which the court is required to consider.

2. STREET RAILROADS—INJURY TO PERSON ON TRACK—CARE REQUIRED.

The degree of care required from a motorman on an electric street car traversing the streets of a city to avoid injury to persons upon the track is different and greater than that required from the engineer of a railroad train running on the company's right of way, where any person upon the track is a trespasser, to whom the company owes no duty except not to injure him willfully or maliciously, but in ·either case the care to be exercised must be proportioned to the danger reasonably· to be apprehended at the time and place.

**3. SAME.**

The motorman of an electric street car, at about 10 o'clock at night, when in the outskirts of Chicago, saw an object lying on the track about 65 feet ahead, which both he and a passenger standing beside him thought to be a dog. He at once applied the brakes and sounded the·gong, and, on approaching a little nearer, reversed. On coming nearer still, the object was seen to be a man, and, there.being a down grade, the car did not stop until it ran upon and killed him. The place was not a crossing, and the locality was sparsely settled, there being a few houses only on one side of, the street, and on the other open prairie. The street was not lighted nor used for travel, there being a ditch on each side of the car track. The motorman saw the object as soon as it was possible to see it from his position, under the circumstances. *Held*, that he was not guilty of any negligence which rendered the company liable for the death.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

In a suit pending in the court below, the appellee, John McNulta, was appointed receiver of the Calumet Electric Street-Railway Company, in succession to John C. McKeon, who was operating the railway at the time of the occurrence which is the subject of contention here. The appellant, John Stelk, administrator of the estate of George Ware, deceased, filed his intervening petition in that cause, seeking to recover damages for the death of his intestate, caused, as alleged, by the negligence of the motorman in charge of the car which ran upon and killed him. Upon issue being formed, the matter was referred to a master, who reported the following facts with respect to the accident: On the 29th day of August, 1897, at 40 minutes past 9 o'clock p. m., George Ware was killed by car No. 233, south bound, on the Roby Division of the Calumet Electric Street Railway, a little southeast of Ninety-Third street. Ware was 39 years of age, and his business was that of a grain trimmer on boats, and he earned from $35 to $40 per week. The railway crossing Ninety-Third street runs in a northwesterly and southeasterly direction. In approaching the crossing at Ninety-Third street from the northwest, there is a slight rise in the roadbed of the railway, from a point 140 feet northwest from the south line of Ninety-Third street. The highest point of the incline is a little south of the south line of Ninety-Third street extended. From that point southeasterly the grade is downward for about 100 feet, the incline downward in that distance being 4 feet. About 40 feet north of the north line of Ninety-Third street there is a switch leading to a track turning thence east on Ninety-Third street. South of Ninety-Third street there is a ditch on each side of the car tracks. The car stopped a moment at the switch, and then proceeded up the incline. Upon crossing the south line of Ninety-Third street the motorman saw an object on the track between the rails at a point about 65 feet in front of the car. At this time the speed of the car was probably not less than six nor more than eight miles an hour. The night was quite dark, and there were no street lamps or other lights lighting the spot where the object lay, except such as was thrown upon it by the headlight of the car. When the motorman saw this object, a messenger boy was standing by his side. The motorman said to the boy that there was something on the track, and that it seemed to him it was a big black dog, to which the boy replied that he thought so too. Neither the motorman nor the messenger boy was able at that time and distance to determine what the object really was. As soon as the motorman saw the object, he rang the gong and applied the brakes. When the car had gone a little further, seeing that the object did not move, the motorman applied the reverse, but being on the down grade the reverse did not act. When the car had almost reached the object, the motorman saw it to be a human being lying partly across the space between the rails, but not across the rails, the head towards the southeast, the feet towards the northwest, and the body lying on the side, with the face southward, and clothed in dark garments. The car not having been brought to a stop when it came in contact with the body, the body was pushed before and under it for about 8 or 10 feet before the car came to a full stop. When his body was taken from under the car, Ware was dead or in a dying condition. From the place where the car stopped at the

switch the body could not be seen by the motorman in broad daylight, because of the convexity of the roadbed between these two points. When the car had passed 50 feet south of the switch, and was about 90 feet from the top of the incline, and about 155 feet from where the body lay, a straight line drawn from the eyes of the motorman, as upon the car, to the place where the body lay, would have just touched the highest point of the incline. Both the motorman and the messenger boy standing by his side testify that the motorman was looking ahead, and that the object on the track was not seen, and could not have been seen, by the motorman until he reached the top of the incline. Evidence was introduced on behalf of the intervening petitioner tending to show that the object might have been seen sooner, but considering all the evidence in the case, the master finds that the motorman, as was his duty, was looking forward upon the track, and that he did not see the obstruction until he reached the top of the incline.

The master found the following conclusions of law:

"(1) Under the evidence in this case, the motorman was not guilty of any negligence whatsoever in not having observed the obstruction upon the track until, as shown by the evidence here, he did so. Since the night was dark, and there were no lights to illumine the place where the object lay, the object could not be distinguished until the car arrived at the top of the incline, and the headlight threw its rays upon the object.

"(2) Under the evidence in this case, therefore, the liability of the defendant depends upon this question: What was the duty of the motorman when at the top of the incline, and about 65 feet from where Ware lay, he first saw something upon the track between the rails, and thought it to be a large black dog? The motorman owed a duty to his employer, a duty to the public, and a paramount duty to any person who, rightfully or wrongfully, carelessly or otherwise, was known to be upon the track. It is clear that, had the motorman been aware when he first saw the object that it was a human being, his obvious duty would have been to stop the car as quickly as possible, and it is equally clear that such would have been his duty if there was any reasonable cause for his believing it to be a human being."

"(5) While the question is by no means free from doubt, the master is of the opinion that, under the circumstances of this case, as soon as he saw the object on the track, the exact nature of which he could not determine, but which he thought was a big black dog, the motorman should have immediately put forth every effort to stop the car, and to ascertain what the object really was, and, having failed to do so, he was guilty of such negligence as renders the defendant liable for the death of George Ware."

Upon exceptions filed and upon hearing, the court below made the following decree, dated September 11, 1899: "This matter coming on to be heard by the court upon exceptions of the receiver to the master's findings of fact and conclusions of law, and the court, having heard the testimony and arguments of counsel, finds that the master's findings of facts are sustained by the evidence, and that the master's fifth conclusion of law, based on said findings, is erroneous. It is therefore ordered, adjudged, and decreed by the court that the exceptions of the receiver to the master's said findings of fact be, and the same are, overruled. It is further ordered, adjudged, and decreed by the court that the receiver's exception to the master's fifth conclusion of law be, and the same is hereby, sustained. The said intervening petition is therefore dismissed for want of equity."

Afterwards the parties entered into and filed the following stipulations of facts:

"It is further stipulated that the following are facts in this case, in addition to the facts as found by the master in chancery, to whom this cause was referred: That one Thomas Murray, at the time of the accident, was standing with one Martin on the east side of South Chicago avenue, and on the south side of Ninety-Third street, where they cross and make an acute angle, which is best described by saying it was at the southeast corner of the two streets. That he noticed a car coming southeast on South Chicago avenue, just as it had got over a switch that is there, a short distance north of Ninety-Third street. That he noticed a man about 150 feet southeast of the car, and he appeared as though he had been coming up out of a ditch or trench there. He

saw the man coming up out of the trench, and as he got to the top of it he stumbled across the tracks. At this time Murray was 25 or 30, or possibly 40, feet from the car at this corner, and the car was almost even with Murray, and it was light enough for Murray to see the car and the man. That at this time he heard a humming noise come from the car. That he saw the motorman when he first saw the car, just as the car passed over the switch. That when the man stumbled he fell between the two rails. That at the time the man fell the car was, in the judgment of Murray, 150 feet away from the man. That there is a city fire-engine house on this street 88½ feet south of the southeast corner of Ninety-Third street and South Chicago avenue. That Murray hallooed to the motorman to turn off his power. That the car dragged the man 8 feet. (2) That, when found dead under the car, the deceased had a five-cent piece in his hand, and he let go the five-cent piece, and it dropped to the ground. (3) That an electric car, equipped in practically the same way as the car in question, can be stopped on a clear, dry rail, when going 8 miles an hour on a level track, within a distance of 40 feet. (4) That witness William P. Martin, who was with witness Murray, heard Murray utter an exclamation, and saw him start to run. That he (Martin) did not see any object, but started to run right after Murray. That he (Martin) first saw the man when the car was about 25 or 30 feet from him. That the car ran over the man, and Martin helped pull him out. That this witness testified that on that night at that point he could see 200 feet."

"(1) That beginning at Ninety-Third street, and running southeast therefrom, the Calumet Electric Street Railway runs through a low prairie, and that the tracks of said railway are there laid on earth and cinders filled in across said prairie. (2) That, when the motorman and the passenger standing by his side first saw the dark-colored object on the track, neither the said motorman nor passenger was in doubt as to what the object really was; that the object, as it appeared to them, was a big black dog, which would be frightened from the track by the ringing of the gong. (3) That, when the motorman and the said passenger first saw the said object on the track, the said object, as it appeared to them, was something which would not be injured, and which would not endanger the car or passenger. (4) That from the time the said motorman and passenger first saw the object on the track, up to the time the said motorman discovered the object was a human being, the said object appeared to said motorman to be a big black dog. (5) That, at the spot where the object lay upon the track, the said motorman had no reason to expect to find a human being. (6) That, prior to the time the motorman discovered the real nature of the object, the said motorman had no idea that the object was other than a big black dog,—no thought that it was a human being. (7) That, at the spot where the object lay, there was no pathway or roadway across or along the car tracks, except the sidewalk running parallel with the tracks, and located east of the tracks, with a ditch between the sidewalk and the tracks; that the country west of the car tracks, and south of Ninety-Third street, is a low prairie, unoccupied by buildings of any kind."

Thereupon the appellant brings the cause here for review.

Alfred F. Gross, for appellant.

Kenesaw M. Landis, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

We might properly disregard the stipulations of the parties with respect to facts not found by the master or the court below, and made subsequent to the decree. We sit here to review the rulings of the court below, not to pass judgment upon stipulations of parties made subsequent to such rulings, and not properly preserved in a bill of exceptions or verified as part of the record by the certificate of the

judge. We deem it proper to make these observations upon the practice pursued, although we have concluded in this case to waive the irregularity, and to consider these stipulations.

The sole question here is whether, with respect to this accident, negligence can properly be imputed to the motorman in charge of the car. The principle of law which should control judgment of his conduct, under the facts disclosed, cannot be doubtful. In the case of Railroad Co. v. Prewitt, 59 Kan. 734, 54 Pac. 1067, to which we are referred, the driver of a locomotive in open daylight saw an object upon the railway track of the company, but supposed it to be a weed or piece of paper. Observing it carefully, so soon as he discovered the object to be a human being he did all in his power to stop his train, but without avail, and the child was killed. The court ruled that the duty of checking the speed of the train was not imposed upon the driver of a locomotive upon seeing an object upon the track which he reasonably believed to be inanimate, and not dangerous to the passage of the train, but that the duty arose immediately upon the discovery that the object was a human being, or an object endangering the passage of the train, and reversed the judgment of the court below, which had held the duty to be imposed upon the driver of a locomotive to check the speed of his train immediately upon discovering an object ahead, whatever that object might be. We cannot doubt the correctness of this decision of the supreme court of Kansas, when applied to the passage of trains upon the right of way of the company; for in such case the law is settled that the company owes no duty to trespassers upon its tracks except not to run them down willfully or maliciously. Railway Co. v. Phillips' Adm'r, 24 U. S. App. 489, 12 C. C. A. 618, 64 Fed. 823; Sheehan v. Railway Co., 46 U. S. App. 498, 22 C. C. A. 121, 76 Fed. 201. The locomotive driver has the right to assume that the object, if animate, will leave the track upon hearing the coming train. It is quite a different matter, however, where railway trains, whether propelled by steam or electricity, pass along the crowded thoroughfares of a populous city. The care to be exercised is relative, and must be proportionate to the dangers reasonably to be apprehended. Here the locus in quo was in the outskirts of the city of Chicago, but was sparsely populated; there being, according to the facts found and stipulated, no houses on the westerly side of the railway, and along the easterly side there was a sidewalk of some sort and a few houses. It was an open prairie. The track of the railway may have been laid upon ground that was platted as a street, but there was no roadway for the passage of teams, and there was a ditch on either side of the railway. There were no street lights, as is usual in a city. The motorman, on reaching the crest of the incline, saw, at a distance of 65 feet an object upon the track, which both he and the messenger boy standing with him upon the platform of the car took to be a dog. He immediately applied the brake, checking the speed of the car, and sounded the gong to arouse the supposed animal, and cause it to leave the track.

It is stipulated that the motorman had no reason to expect a human being to be upon the track at that place or at that time. The record does not explain the presence of the man, and we are unable to ascer-

tain with what purpose or for what object a human being should be in that situation. The stipulation of fact is certainly reasonable that the motorman had no reason to expect the presence of a human being upon the track. We do not think, therefore, that the duty was imposed upon him, upon perceiving an object, to bring his car to a stop to discover the nature of the object. He did no less than his duty required of him to check the speed of the car and sound his gong, and so soon as he perceived that the object did not respond to the signal he reversed to bring the car to a standstill. Upon a level, under such circumstances, the car could have been stopped within 40 feet, but, it being upon a downward grade, it could not be stopped within that distance. We cannot perceive that the motorman was lacking in any degree in the exercise of that prudence and care which, under the circumstances, the law imposed upon him. The decree will be affirmed.