159 So.2d 823

**ALABAMA GREAT SOUTHERN RAIL-ROAD COMPANY**

v.

**Ellis W. GREEN.**

**6 Div. 865.**

Supreme Court of Alabama.

Jan. 16, 1964.

Olin W. Zeanah and Jere L. Beasley, Tuscaloosa, for appellee.

———◆———

Cabaniss & Johnston, Birmingham, and Jones, McEachin & Ormond, Tuscaloosa, for appellant.

HARWOOD, Justice.

The plaintiff below was the mother of a child ten years of age who drowned in a pond or pool located on the right of way of the defendant company. The complaint alleged that the pit or reservoir contained a large amount of dirty, unclear water in sufficient depth to cover and conceal metal rods or spikes embedded in the ground or concrete on the bottom of said excavation

or reservoir; that said metal rods stood upright and were sharp and dangerous; that the said pit or reservoir was attractive and alluring to children of tender years, and was exceedingly dangerous when left unguarded, and the reservoir gave every appearance of being a pool of water and the existence of the metal spikes was concealed; that the defendant knew or should have known the above facts and should further have known that the reservoir was located in a populous area; and that the said reservoir was nevertheless negligently maintained without guards or warning of any kind.

The complaint further avers that the plaintiff's minor son while playing at or near the reservoir was attracted by the same and climbed into or fell into said reservoir and as an approximate consequence thereof became entangled or hung on said metal rods or metal spikes which were concealed below the surface of the water, or fell against or on said spikes injuring himself, and as a direct or approximate consequence the plaintiff's son was caused to drown.

A demurrer to the complaint containing some 226 grounds was overruled by the court, and thereafter pleading was in short by consent.

The evidence shows that about 1,000 feet east of the defendant's railroad station in the city of Tuscaloosa, a ditch or creek flows, by means of a culvert, under an embanked section of the defendant's railroad tracks. About 50 years ago the defendant had constructed a rectangular wooden form and fitted it into an excavation in the bed of the branch at the lower side of the culvert. This was done for the purpose of making a water reservior from which its steam engines could be supplied with water. With the advent of diesel engines the reservoir was no longer used. Use of the reservoir was discontinued some 13 to 35 years ago. The wooden form apparently rotted and disappeared, and the metal rods which had been used to anchor the form remained in the pool in an upright position.

According to the witnesses, the pool was constantly filled with water variously described as real dirty, muddy, or unclean, and in its deepest part was about 8 feet deep. At the concrete apron on the lower side of the culvert were some metal rods fastened into the apron. These rods were exposed and varied in length. Other rods were in the pool, and depending upon the stage of the water and the length of the rod, might or might not be exposed. For instance, James Green, an uncle of the deceased boy, testified that on the Sunday morning following the drowning of Ronald Green the day before, "There was a lot of them sticking up and about nine sticking out from the concrete, and then out in there was some sticking up, a lot of them."

A photograph of the pool was received in evidence. It shows that the pool is oblong shaped and probably some 40 feet wide. Spikes protruding from the surface of the water can be observed and at least one of these spikes is toward the center of the pool. Even in the photographs the water appears turbid and scummy. On one side there are two old automobile tire casings partly submerged near the bank.

On Saturday, 15 April 1961, the deceased, Ronald Green, with his brothers Reginald, age 13, and George, age 10, and two friends, Jesse Smith, age 11, and Charlie Smith, age 10, were searching for tadpoles. They lived in a residential area not far from the pool, but the boys had apparently not visited the pool before. Ronald, the deceased, had a tin can. The boys separated around the pool, and their attention was attracted by Ronald helloing to them. Ronald, at the time, was in the pool and making swimming motions though he did not move forward. His brother, Reginald, took a belt and threw the end out to Ronald, Reginald holding the buckle end of the belt. He attempted to pull Ronald from the pool but Ronald wouldn't move. The belt slipped out of Reginald's hand and Ronald went back "his body went back but he didn't. The bottom part of his body didn't move." Reginald then ran for his mother who came to the

pool. According to Jesse Smith, when the belt slipped out of Reginald's hand, Ronald went down, came up, and went down again and did not come back up.

All of the boys present with Ronald who were witnesses for the plaintiff, testified that Ronald was fully clothed at the time he fell into the pool.

One of the boys went to a nearby fire station and reported the accident. Immediately Harold Williams, a fireman for the city of Tuscaloosa, Henry Hannah, and Captain Watson of the fire department went to the scene. Williams waded into the pool from a sandbar until the water got up around his neck, and moved around trying to find Ronald. Not being able to locate him he obtained a pike pole from the truck in which he had ridden to the pool and eventually fished the boy out by this method. The body was located near the center of the pool.

Williams and Captain Watson testified that when they retrieved Ronald from the pool he was undressed except for a tight fitting pair of jockey shorts. These witnesses also testified that boys clothes were lying on the bank, as did Mr. Hocutt, another fireman who arrived at the pool during the time artificial respiration was being administered to Ronald.

Roy C. Jones, a police officer of the city of Tuscaloosa, arrived at the time artificial respiration was being administered. He saw some clothes on the bank of the pool and the clothing looked dry. At the time he observed Ronald he did not have any clothing on from his waist up, and he was covered with something from the waist down.

Rufus T. Strickland, coroner of Tuscaloosa County, also arrived during the time the firemen were attempting to revive Ronald by artificial respiration. At that time Ronald had nothing on but shorts, and noticing boys clothes on the bank, he rolled them up and put them near the body. He examined the body for any marks or

bruises and found none. Mr. Williams and Captain Watson also testified that there were no marks, bruises or lacerations on Ronald's body.

The evidence shows that for a number of years children have played in a pasture adjoining the pool. Also there was a path leading from the top of the railroad embankment down to the pool. It was not unusual for children to play in the pasture and it was not unusual for people, mostly adults, to walk from the railroad tracks down to the pool, though children too were also freely around the pool. The plaintiff testified she had never permitted her children to play in the pasture, and she had no knowledge of their ever having gone to the pool. All witnesses agreed that they had never seen any people swimming in the pool, although occasionally adults were observed seining for minnows in the pool, and boys had been seen fishing in it.

Coroner Strickland testified that after investigation he executed a death certificate on Ronald Green. This certificate was introduced into evidence without objection. Thereon the cause of death was listed as "Drowning," and in the box calling for a description of how the injury occurred appears "Waded into deep water." Immediately under this entry appears "Fell in ditch while playing."

Coroner Strickland testified this latter entry ("Fell into ditch while playing") was not in his handwriting, was not authorized by him, and was not on the certificate when he turned it over to the Druid Funeral Service.

Dan Holly, Jr., a witness for the plaintiff, testified that he was an assistant at the Druid Funeral Service. When he embalmed Ronald's body he noticed a sort of bruise on his forehead. This bruise was not apparent until the embalming fluid started filling the capillaries, and then a spot about the size of a twenty-five cent piece turned brown "like some of the skin does." There was no abrasion at the spot.

On cross examination Holly testified that he made no record of this bruise, and told no one about it until a few days before the trial as he "was not supposed to say anything." Holly further testified that his partner is the uncle of Ronald Green.

Holly did not express any opinion as to the age of the bruise.

While the complaint alleges that the rods in the pool were sharp, none of the witnesses for the plaintiff testified as to the shape of the upper ends of the rods. On the other hand, two of the defendant's witnesses, long time employees of the defendant and familiar with the pool, testified that the rods were not sharp. We conclude that the rods were not pointed, but sharp only in the sense that any iron rod of a half inch or one inch in diameter is sharp to one falling against it.

▇▇▇ Under ordinary conditions trespassing children, or children on the land of another as bare licensees, occupy the same position as trespassing adults. Highland Avenue & Belt R. Co. v. Robbins, 124 Ala. 113, 27 So. 422. A land owner is not required to anticipate that children will go where they have no right to be. Sheffield Co. v. Morton, 161 Ala. 153, 49 So. 772.

In 1873 the United States Supreme Court issued its opinion in Sioux City and P. R. Co. v. Stout, 17 Wall. 657, 21 L.Ed. 745. Leon Green in his article "Landowners Responsibility to Children," 10 Tex.L.Rev. 1, characterizes the opinion as a simple one, tried in a simple negligence theory and affirmed on the same basis. Stout, a six year old child, was injured while playing on an unlocked turntable in a small Nebraska town. As pointed out by Green, supra, the furor over the opinion arose over the rejection of the centuries old doctrine that a landowner owed a trespasser no duty of care, and the substitution therefor of the idea that under certain circumstances the landowner could be responsible for injuries to children lured onto his land by situations especially attractive to children. Negli-

gence had triumphed over trespass and its accompanying protections thrown about the landowner where the trespasser was a child.

The doctrine of the Stout case, supra, soon found wide support in the state courts, many of which liked the conclusion reached, but not the basis of the conclusion, i. e., the abandonment of the doctrine that a landowner owed no duty of care to trespassers, even child trespassers. To justify this new concept came the enunciation that where a landowner creates a situation attractive to children he thereby impliedly invited them onto his land. Having thus raised trespassing children to the status of invitees the enlarged legal duty owed them in this new status naturally attached. This theory was first put forward by the Supreme Court of Minnesota. (See Keffe v. Milwaukee and St. P. Ry., 21 Minn. 207, 18 Am.Rep. 393 (1875).) This "invitation" doctrine was quickly adopted by many courts, though Green characterizes the reasoning of these cases as being a neat balancing of one morality against another in an ascending spiral, leaving the doctrine vulnerable to attack. Continuing, Green writes:

"Courts which originally rejected the Stout doctrine have now accepted it. Even some of the courts which gave support to the 'invitation' theory of duty have given it over for that of the original case. Among them perhaps the frankest is the Minnesota Court which originated the 'invitation' doctrine. It said: 'We conclude that the idea of invitation, expressed or implied, actual or factual, as condition precedent to liability in the case of young children, injured as was the plaintiff here, should be finally and emphatically discarded. They are trespassers, but, because of their tender years and the consequent lack of perception and responsibility, liability results notwithstanding the trespass.' There are many other recent cases in which the same position is taken."

In 1901 this court, in a turntable case, adopted as sound the doctrine of the Stout

case, (Alabama Great Southern Railroad Co. v. Crocker, 131 Ala. 584, 31 So. 561).

The court placed its decision on the basis that regardless of however exclusive may be the landowner's rights, he is subject always to the maxim "sic utere tuo ut alienum non laedas." This same doctrine was the basis of the decision in Williams v. Bolding, 220 Ala. 328, 124 So. 892, though in addition the court seems to have adopted the "invitation" theory as well. Since the attractive nuisance (dynamite caps) was left in a culvert in a public road under construction, no question of the status of the child, that is whether trespasser, bare licensee, or invitee actually was involved, the court's observations as to the child being an invitee was dictum.

As observed by Prosser in his work on Torts, at page 439:

"On the other hand the courts which accept the principle" (attractive nuisance doctrine) "are notably cautious in applying it, and have voiced occasional expressions of doubt about it * * *."

This court has also stated that it has been reluctant to extend the doctrine, and the tendency is to deny it to new situations. See Alabama Power Co. v. Kirkpatrick, 268 Ala. 338, at page 340, 105 So.2d 855, at pages 856–857.

■ As to water hazards resulting from pools, or ponds, this court has continuously held that such are not within the influence of the attractive nuisance doctrine. As stated in Luallen v. Woodstock Iron and Coal Corp., 236 Ala. 621, 184 So. 182:

"In Cobb v. Lowe Mfg. Co., 227 Ala. 456, 150 So. 687, after freely admitting that pools have a lure for children, the Court added [page 688]: 'But this court, in line with reason and the great weight of authority, has declined to extend the doctrine of attractive nuisance to such conditions, so as to impose on the owner of property a legal duty to erect barriers, or other safeguards to protect children, not in-

vitees, from water hazards. They exist everywhere in nature, and take a toll of the lives of adventurous youth, and betime those of very tender years.' This holding was in perfect accord with the previous decisions of the Court. Cox v. Alabama Water Co., 216 Ala. 35, 112 So. 352, 53 A.L.R. 1336; Eades v. American Cast-Iron Pipe Co., 208 Ala. 556, 94 So. 593; Ellison v. Alabama Marble Co., 223 Ala. 371, 136 So. 787; Athey v. Tenn. Coal, Iron & R. Co., 191 Ala. 646, 68 So. 154. See, also, W. F. Bradley Lumber Co. v. Crowell, [28 Ala.App. 12] 178 So. 66, certiorari denied 235 Ala. 223, 178 So. 68.

"And we have held the doctrine of the 'turntable' cases is inapplicable where the danger is obvious and patent. Williams v. Bolding, 220 Ala. 328, 124 So. 892; Ford v. Planters' Chemical Co., supra [220 Ala. 669, 126 So. 866]."

Counsel for appellee contends that even though water hazards are not to be considered as attractive nuisances, the facts here disclose a dangerous condition created upon the defendant's land of such nature that children were likely to be injured thereby, and the defendant should reasonably have anticipated a likely injury, and the defendant should have taken reasonable steps to guard against such happening. Counsel further contends that the submerged rods constituted a hidden danger, a trap, or pitfall, the continuing existence of which constituted negligence.

In Cox v. Alabama Water Co., supra, the appeal was from a judgment of non-suit taken upon the sustaining of demurrers to the complaint. The complaint alleged that the defendant water company had built a reservoir near a school and at a place where children resorted to play. The reservoir, some 130 feet long, 40 feet wide, and 25 feet deep, had concrete sides sloping at an angle of forty-five degrees. Through the years, slime, moss, or silt, some two inches thick had collected on the concrete walls. The complaint alleged that the moss, slime, or silt, was hidden below the surface of

the water which came to within five feet of the edge, and was a concealed danger unknown to the children who resorted there to play, or who used a path near the reservoir in going to and leaving school; that if a man or child fell into the reservoir it was impossible for him to get out because of the slippery condition of the reservoir; that no fence was maintained around the reservoir and the plaintiff's son, eight years of age, "wandered or was attracted to said pool, cistern, or reservoir, and to said cement run-a-round, and that he either fell in or stepped in, and that, owing to said hidden danger of said slime, moss, or silt, he could not get out, and he was drowned," and that the death was proximately caused by reason of the defendant negligently maintaining said condition.

In affirming the action of the lower court in sustaining the demurrers to the complaint, and after pointing out that in those jurisdictions recognizing the turntable doctrine (attractive nuisance) the majority of such courts, including this court, deny the liability of a landowner for injuries to trespassing children by reason of open and unguarded ponds upon his premises. The opinion then continues:

"If there be any cogency in what has been said, there is no need for an extended discussion of appellant's second suggestion of ground of liability, viz., that defendant allowed a slime to accumulate on the sloping sides of its reservoir, thus—such is the effect of the argument—setting a trap for boys who might fall into the reservoir. A like argument appears to have been suggested in United Zinc Co. v. Britt, supra [258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615], and we have found it in some other cases. In the case just mentioned the court disposed of this suggestion in the following language:

" 'The liability for spring guns and mantraps arises from the fact that the defendant has not rested on that assumption [viz., the assumption that the owner of land owes no duty in the case of trespassers to remove even hidden dangers], but on the contrary has expected the trespasser and prepared an injury that is no more justified than if he had held the gun and fired it.'

"That, to us, seems to be a reasonable conclusion. Appellant's contention in this regard would require the owner of every pond, reservoir, or waterway to so prepare his property as that, if trespassing boys should fall in, there would be no danger of drowning. That, we think, would be an unreasonable requirement."

In Cobb v. Lowe Mfg. Co., 227 Ala. 456, 150 So. 687, the defendant company maintained a drainage ditch on its premises. At one point the company had installed a culvert under a public street some seventy feet wide. Due to rains the ditch was flooded, and water was over the intake of the culvert by several inches. This intake, was on defendant's property by a few inches. The plaintiff's son, nearing his seventh birthday, went under a handrail along the street, and while reaching over and playing with debris in the water, fell in. He was sucked into the culvert and drowned.

The court gave for the defendant its requested charge affirmative in nature. In affirming this action by the lower court, this court stated that counsel argued that an added element of potential danger was the suction of the culvert, a condition not appreciated by a child of tender years, especially when the water arose above the culvert intake.

In disposing of this argument the late Bouldin, J., wrote:

"Moreover, this culvert was not a hidden danger, but clearly observable to one of sufficient maturity to appreciate its effect upon the current. *We have, in such case declined to impose a legal duty for the special protection of children of tender years who may perchance fall into a stream.*" [Italics ours.]

■ We have set out the condition of the pool or pond involved in the present case. It was such that any person of reasonable maturity should have appreciated its hidden dangers. No special protection is accorded children under such circumstances. Cobb v. Lowe Mfg. Co., supra.

■ We are clear to the conclusion that the doctrines set forth in Cox v. Alabama Water Co., supra, and Cobb v. Lowe Mfg. Co., supra, necessitate the conclusion that under all the evidence presented, the defendant below was entitled to have given its requested charge No. 1, which was affirmative in nature.

Assignment of error No. 1 related to the overruling of defendant's demurrer to the complaint.

The legal principles above written to also necessitate the conclusion that this assignment is meritorious.

The complaint in substance avers that the defendant negligently maintained a pit, excavation, or reservoir in the open and without guards or warning; that the said reservoir contained a large amount of dirty, unclear water in sufficient depth to conceal sharp metal spikes or rods; that the reservoir was alluring and attractive to children and was located in a populous area where the defendant knew children were accustomed to play; that the deceased was attracted to the reservoir and climbed or fell into the same, became entangled or hung on a metal rod, or fell on or against a rod and as a proximate result was caused to drown.

Under the complaint, and our decisions to the effect that a pond or pool is not considered to be an attractive nuisance, the deceased child must be considered to be a trespasser, or as aptly termed by Bohlen, a "mere tolerated intruder." See 69 Penn. Law Rev., at page 248.

■ Further, under our decisions a landowner is under no duty to maintain pools or ponds in such fashion that there is no danger of drowning if a trespasser falls therein. Submerged conditions hidden by the water, but adding to the danger of a trespasser entering the pool are not to be regarded as a pitfall or trap. Cox v. Alabama Water Co., supra. Nor is there any increased legal duty for the special protection of trespassing of children of tender years imposed under such circumstances. Cobb v. Lowe Mfg. Co., supra.

■ A landowner is not bound to provide for a trespasser's safety from undisclosed dangers on his land, or to interrupt his otherwise lawful occupation to provide for the chance that someone may unlawfully be there. He only must refrain from intentionally injuring the trespasser, or laying a trap for him. Erie R. Co. v. Hilt, 247 U.S. 97, 38 S.Ct. 435, 62 L.Ed. 1003. See also, Alabama Great Southern R. Co. v. Cummings, 211 Ala. 381, 100 So. 553, 33 A.L.R. 439.

■ Where the injured party is a trespasser, a trap or pitfall exists only if the landowner prepares the dangerous condition in expectation of the trespass. Moseley v. Alabama Power Co., 246 Ala. 416, 21 So.2d 305.

■ A toleration of trespassers does not alter their status. Ellison v. Alabama Marble Co., 223 Ala. 371, 136 So. 787.

■ The complaint therefore fails to aver facts showing a legal duty owed by the defendant to the plaintiff's son, and which was the proximate cause of his death. There can be no actionable negligence without breach of a legal duty. Eades v. American Cast-Iron Pipe Co., 208 Ala. 556, 94 So. 593, and cases therein cited; Cox v. Alabama Water Co., supra.

The lower court therefore erred in overruling the demurrer to the complaint.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.