44909. RYCKELEY v. GEORGIA POWER COMPANY.

WHITMAN, Judge. This action by a mother for the alleged wrongful death of her 11-year-old son resulted in a directed verdict for the defendant. The decedent was killed when he climbed approximately 40 feet up the defendant's power line tower, came in contact with a high voltage line, was shocked, and fell to the ground. The plaintiff has appealed, enumerating the directed verdict and several evidentiary rulings as error.

The tragedy occurred at a location between the home of plaintiff

and her family and the elementary school which the decedent attended. The decedent was killed on a Saturday afternoon. Between the plaintiff's home and the school was an undeveloped, heavily wooded area. The defendant's right of way, containing its high voltage power lines and supporting towers, was located in this area. An abandoned road known as Willis Mill Road ran through the area. The road could be walked upon. From plaintiff's kitchen window she could see the school grounds, as well as about four of defendant's transmission line towers. It was customary for the decedent and his friend, Thomas Humber, to come home from school through the woods and under the defendant's transmission lines. The path previously referred to passed within 10 to 20 feet of the tower involved in the decedent's death. During the afternoon of September 25, 1965, the decedent and his neighborhood friend, Thomas Humber, and decedent's cousin, David Ryckeley, went to play in the nearby woods. All three boys were sixth graders and about 11 years old.

Thomas Humber testified that he lived across the street from the decedent; that they were close friends; that he and the decedent had climbed up the tower several times during the past year; that they would climb up "to look around"; that there were no fences along the right of way or around the tower; and that there was no barbed wire around or on the tower to keep one from climbing.

From the evidence it appears that the towers were constructed basically of what is called "angle iron." There are four legs of rather large angle iron, each anchored to a foundation. The four legs form the corners of the tower. The legs get progressively closer together as they go up the tower until they meet. All four legs are connected to one another from bottom to top by a myriad of diagonal and horizontal braces. The majority of the braces consist of small angle iron. Climbing of the tower is made possible by a number of bolts installed in one of the tower's corner legs. Each bolt is installed so that after installation there remains a sufficient length of the bolt protruding from the leg suitable for a hand or foot hold. The climbing bolts start about 6½ feet up the leg of the tower and are evenly spaced from there on up.

Thomas Humber testified that they were able to get onto the tower by first stepping up one of the braces, then grabbing the climbing bolt, and then pulling up. He further testified he had never told anyone he had climbed the tower or asked permission to do so because he was afraid he would be told not to do so because of the danger of falling. He testified he knew it was dangerous to climb the tower but only for the reason of the danger of falling. He further testified that he had seen a sign attached to the tower, but it could not be read because it was rusted and full of holes. He stated that the sign shown him in a photograph was not the sign which was on the tower when the decedent was killed. When asked what a sign saying "Danger, High Voltage, Do Not Shoot at Insulators" meant, he said it means that: "There's high voltage that runs through that, and it's dangerous to shoot at the insulators." He testified that he had learned something about electricity and batteries in his science courses at school but nothing about high voltage wires. When asked what he had thought was on those big towers which he walked under going back and forth to school, he said: "I guess I knew it was electricity, but I didn't think about it that much."

In any event, Thomas Humber testified that on this day the decedent went up first, he went second, and David, who had never been before, went last; that they climbed up to a point where some horizontal braces go around all sides of the tower, which they called a ring; that there were three levels or three rings and they went to the top ring; that the decedent moved around the tower along the ring until he was on the opposite corner from which he had ascended; that at such corner is where one of the wires was attached to a large insulator; and that he saw the decedent touching the wire with his foot. He testified that he heard a loud bursting noise with sparks and smoke and saw the decedent slump down and fall to the ground. He and David immediately climbed down and ran as fast as they could for help.

David Ryckeley's testimony is substantially the same as that of Thomas Humber regarding what happened atop the tower. He testified he had seen a sign on the tower on that day but it had

.22 holes all through it and was rusted around each hole; that he really did not look at it too much so he could not say whether it could be read except perhaps for the word "insulators," but he did not think the sign he has seen on the tower since that time was the same one that was on the tower the day the decedent was killed. He testified that he was not concerned about electricity because he had seen birds land on the wires and fly away. He stated he knew from the height of the tower and the way it was constructed that it was dangerous to climb.

Mrs. Patrinella Mutzberg testified for the plaintiff that she went to the tower the following Wednesday, that she is 5 feet, 5½ inches tall, and was able to reach the climbing bolt on the leg of the tower. She also testified that a few days later she observed that a perforated and rusty sign which was difficult to read had been changed.

Without attempting to recount the remaining evidence in detail, when it is construed most favorably for the plaintiff it can fairly be said to have been established by her that the power line right of way contained a lot of debris such as discarded refrigerators, stoves and washing machines; that the tower under consideration did not comply with the requirements of the National Electrical Safety Code regarding the relative height of the lowest climbing bolt, a measure meant for protection of the general public; that such bolt was 6½ feet up the leg when measured along the leg itself but only 4 feet and 11 inches above the top of a mound of dirt located very close to the leg; that devices such as barbed wire or chain link fences are available to prevent access to towers; that a reasonable interpretation of the National Electrical Safety Code requires the use of such devices where towers are located near public school grounds and thoroughfares; that the wires attached to the tower were not wrapped with any insulating material in the vicinity of the tower or elsewhere. It can also fairly be said to have been established that it is instinctive in children to climb things; that the defendant had knowledge that people had been coming within the right of way and were shooting at the insulators on this tower; that the defendant does not have any par-

ticular department or person in its entire organization charged with the responsibility of anticipating and acting upon safety measures as regards the general public's protection from electricity; and that even with regard to such a tower that might be located in a children's playground, the policy of the defendant is not to erect any fences or guards which would prevent climbing a tower unless and until first requested to do so by someone. Finally, it was stipulated that the land upon which the tower was situated was owned in fee simple by the defendant. *Held:*

1. In *Crosby v. Savannah Electric &c. Co.,* 114 Ga. App. 193 (150 SE2d 563), a 15-year-old boy, with the mentality of an eight or nine-year-old, climbed up a power pole to retrieve a helium filled balloon, which had escaped and caught in defendant's power lines, and there came in contact with uninsulated high voltage wires. It was held that the young boy's legal status while on the pole, irrespective of his age, was that of a trespasser; that permission or consent to climb the pole could not be implied even though the owner may have had knowledge that children customarily played in the area of the pole; and that any status of a licensee as to the ground would not extend to the pole. In the *Crosby* case the boy was able to ascend the pole by making use of objects close to or fastened to the pole, but which were not there for the direct purpose of climbing. In the present case objects meant for no purpose other than climbing the tower were accessible from the ground. But in our view this factual distinction is an immaterial one. The climbing bolts create no more of a license or invitation in law for one to go upon the tower than would the existence of stairs leading to a place where one has not acquired some status that would authorize his presence there.

When the decedent and his friends climbed the tower they were trespassing.

2. The facts show that the defendant's wires were uninsulated, save for air. There is evidence in the record that this was by design and not by inadvertence. Had the wires been wrapped with insulating material, the decedent might not have been harmed. But as a general rule the owner or occupier of land is under no duty to a trespasser, whether an adult or an infant,

so far as the condition of his premises is concerned. *Savannah, F. & W. R. Co. v. Beavers,* 113 Ga. 398 (39 SE 82, 54 LRA 314).

"In the case of a trespasser, liability arises only where the injury has been occasioned by the wilful and wanton negligence of the owner. No duty of anticipating his presence is imposed, even as to an infant trespasser, as was pointed out in *Charleston & W. C. R. Co. v. Johnson,* 1 Ga. App. 441 (57 SE 1064); and the duty to use ordinary care to avoid injuring him after his presence and danger are actually known is, in point of fact, merely the duty not to injure him wantonly and wilfully." *Cook v. Southern R. Co.,* 53 Ga. App. 723, 726 (187 SE 274). The evidence in the present case shows that the defendant had actual knowledge that people had been coming onto the right of way and had been shooting at the insulators on the tower. The evidence further shows that a sign was put on the tower for the dual purpose of discouraging people from shooting at the tower insulators and to warn that climbing it was dangerous because of the high voltage wires atop it. It could be said that the presence of people had been anticipated. But there is absolutely no evidence that the defendant had any knowledge that people had actually ever been climbing up this tower or, more pertinent, that the defendant had any knowledge of the decedent's presence on the tower which, if so, would have invoked a duty in the defendant not to wilfully or wantonly injure him.

With regard to the condition of the sign, it could be said that the evidence shows the sign was not serving the purpose for which it had been erected for it had become illegible. But the presence of an illegible sign can not be regarded as a breach of any duty owed to one who is trespassing.

3. The appellant's contention that the tower supporting the uninsulated high voltage wires some 40 feet above the ground is a mantrap is wholly without merit. See *Crosby v. Savannah Electric &c. Co.,* 114 Ga. App. 193, 198, supra.

4. The appellant strongly contends that the tower in this case comes within the attractive nuisance or "turn-table" doctrine. When the doctrine is applicable it works to impose a higher duty on the owner of property than that which ordinarily exists

with regard to trespassers. "In the taxonomy of negligence law, the attractive nuisance doctrine is but another way of saying that under given circumstances the defendant is liable for the consequences of his negligence where he should in the exercise of ordinary care have foreseen that harm would result to an infant trespasser whose presence he should have anticipated." *Starland Dairies, Inc. v. Evans,* 105 Ga. App. 813, 815 (125 SE2d 682). The doctrine in this State has had a very limited application, being applied only to uncommon instrumentalities which are inherently dangerous as well as attractive. *Southern Bell Tel. &c. Co. v. Brackin,* 215 Ga. 225 (3) (109 SE2d 782). The doctrine has been refused application in cases involving swimming pools and bodies of water, e.g., in *Savannah, F. & W. R. Co. v. Beavers,* 113 Ga. 398, supra, where a 5-year-old boy drowned in an unguarded excavation where he had gone to play with the frogs. In *Mobley v. City of Monroe,* 37 Ga. App. 364 (140 SE 516) it was contended that the reason for an 11-year-old boy's death was that the city's water tower was an attractive nuisance to children; that the decedent was killed when he came in contact with an electric wire after climbing about 20 feet up the tower. Application of the doctrine was refused.

The case sub judice is not a proper one for application of the doctrine.

For a collection of foreign authorities, the majority of which have reached the same conclusion as we do in this opinion, see Annot., Liability for injury of child on electric transmission tower or pole, 6 ALR2d 754.

The trial court did not err in granting a directed verdict for the defendant.

5. The remaining enumerations of error are addressed to certain evidentiary rulings. We have reviewed them fully and find no error. But even if the evidence to which the enumerations are addressed had not been excluded, it would not require a different result from that which we have reached above.

*Judgment affirmed. Bell, C. J., and Quillian, J., concur.*

ARGUED JANUARY 5, 1970—DECIDED JUNE 12, 1970—

REHEARING DENIED JUNE 29, 1970—

Haas, Holland, Freeman, Levison & Gibert. Richard C. Freeman, William R. King, for appellant.

Troutman, Sams, Schroder & Lockerman, Allen E. Lockerman, Robert L. Pennington, for appellee.