This appeal is from an order of the trial court granting summary judgment in favor of the defendant, Alabama Power Company. Plaintiffs, father and son, filed separate actions against Alabama Power Company alleging that on September 3, 1973, Richard Dale Foster, the 15-year-old son of I.J. Foster, climbed a transmission line tower owned or maintained by Alabama Power Company in the vicinity of Overton, Alabama. Young Foster came in contact with a high voltage line, experienced electrical shock and was caused to fall and suffer severe and permanent personal injury.
In their complaints, as last amended, the plaintiffs claimed: (1) that Alabama Power Company was negligent in and about its trade or business; (2) that the power line was negligently maintained; (3) that the defendant wantonly conducted the trade or business of handling the transmission of electricity and did wantonly maintain the power line; (4) that the defendant negligently or wantonly created circumstances which induced persons to go on the tower; (5) that the defendant negligently or wantonly failed to cause a proper warning; (6) that the defendant negligently or wantonly failed to properly maintain warning devices; and (7) that the defendant negligently or wantonly failed to provide or maintain adequate safeguards or barriers, all in the transmission of electricity, a dangerous instrumentality.
Alabama Power answered and moved for summary judgment on the grounds that there were no genuine issues of material fact, on the ground that Richard Dale Foster was a trespasser upon the transmission line tower at the time of his injury and that the only duty owed to him by Alabama Power was not to willfully or wantonly injure him.
The trial court granted Alabama Power's motion for summary judgment on December 11, 1979. Shortly thereafter, the appellants, plaintiffs below, moved to have the court set aside its order and judgment on the grounds that they were not ready for the matter to be submitted to the court for a final order and that they wanted more time in which to perform additional discovery and an opportunity to file a response to the motion for summary judgment before final submission. Thereafter, appellants performed additional discovery and the matter was submitted to the court for a final judgment. Once again, the court found in favor of Alabama Power and issued an order granting summary judgment in its favor on April 16, 1980.
The only issue presented is whether the trial court erred in granting summary judgment in favor of the Power Company. In deciding whether there was a genuine issue as to any material fact which would warrant submission of the case to a jury, we must examine the duty, if any, owed by Alabama Power to Richard Dale Foster, and the applicability of the doctrine of attractive nuisance to these facts in order to *Page 29 
determine the appropriateness of summary judgment on these facts.
In examining the applicability of the doctrine of attractive nuisance, we must determine whether the transmission line tower was a dangerous condition or a dangerous instrumentality. An excellent statement of the rationale upon which the attractive nuisance doctrine is based is found in Tolbert v. Gulsby,333 So.2d 129 (Ala. 1976). The Court stated:
 This doctrine offers an exception to the limited duty owed by a landowner to a trespasser. It applies only where trespassing children are involved. Alabama Great Southern Railroad Co. v. Green, 276 Ala. 120, 159 So.2d 823 (1964); see, Fulford, The Tort Liability of Possessors of Property to Trespassing Children in Alabama, 11 Ala.L.Rev. 1, 9-13 (1958). The doctrine evolved from the "turntable" theory pronounced by the United States Supreme Court in Sioux City and P.R. Co. v. Stout, 84 U.S. (17 Wall.) 657, 21 L.Ed. 745 (1873) and was adopted by this court in the case of Alabama Great Southern Railroad Co. v. Crocker, 131 Ala. 584, 31 So. 561 (1901). The turntable doctrine over the years has been narrowly applied and rigorous standards of application have developed around its use. The most important restriction is that the dangerous condition on the landowner's property must be found to be naturally attractive to small children — thus leading to the "attractive nuisance" terminology.
333 So.2d at 132. Thus, the Court noted that the doctrine only applies where "trespassing children" are involved and where the landowner's property is found to be "naturally attractive to small children."
In the instant case, the doctrine of attractive nuisance cannot apply because Richard Dale Foster was 15 years old at the time of his injury and the evidence presented in connection with the motion for summary judgment shows that he was a boy of intelligence. For example, he was an Eagle Scout. In Central ofGeorgia R. Co. v. Robins, 209 Ala. 6, 95 So. 367 (1923), this Court first discussed a number of cases which held that someone over 14 years of age cannot recover under the doctrine of attractive nuisance and then stated:
 We think this is the correct view of the matter, deducible from the nature of the duty prescribed, and from the necessities of the class for whose benefit the law has raised the duty. Certainly it is in accord with the general consensus of judicial opinion, and it is almost conclusively significant that among all the reported cases we do not find a single instance in which the doctrine of the turntable cases has been applied to, or even invoked by, a child who has passed the age of 14; for the absence of such instances would seem to indicate either a general implicit understanding that youths of 14 and over are not children of "tender years," or else that at that age they are no longer subject to the domination of childish instincts, and do not need the protection of the rule — so far, at least, as turntables are concerned.
209 Ala. at 8, 95 So. 367. Further, this Court, in Abbott v.Alabama Power Co., 214 Ala. 281, 107 So. 811 (1926), citingRobins, stated:
 [T]he plaintiff could not recover, as for an attractive nuisance, as he was a boy of intelligence and over 15 years of age. Central R.R. of Ga. v. Robins, 95 So. 367, 209 Ala. 6, 36 A.L.R. 10.
Appellants further contend that the Alabama Power transmission line tower with its high voltage power line is a dangerous instrumentality. The maintaining of a dangerous instrumentality on one's property creates "straight negligence" liability. Tolbert v. Gulsby, 333 So.2d 129 (Ala. 1976). This doctrine, like that of attractive nuisance, depends upon the status of the injured party in relation to the defendant's land.
In Tolbert v. Gulsby, this Court, commenting upon the duty owed to persons upon another's land, stated:
 Under a negligence count, the duty owed by a landowner depends on the status of the injured party in relation to *Page 30 
the defendant's land. See Mullins v. Pannell, 289 Ala. 252, 266 So.2d 862 (1972); Autrey v. Roebuck Park Baptist Church, 285 Ala. 76, 229 So.2d 469
(1969). If the injured party is determined to have been a trespasser, the landowner owes only the duty not to wantonly or intentionally injure him. City of Dothan v. Gulledge, 276 Ala. 433, 163 So.2d 217
(1964); Alabama Great Southern Railroad Co. v. Green, 276 Ala. 120, 159 So.2d 823 (1964). "Under ordinary conditions trespassing children, or children on the land of another as bare licensees, occupy the same position as trespassing adults." Alabama Great Southern Railroad Co. v. Green, supra; Mullins v. Pannell, 289 Ala. 252, 266 So.2d 862 (1972). If plaintiff is found to have been on defendant's property with his consent or as his guest, but with no business purpose, he attains the status of licensee and is owed the duty not to be willfully or wantonly injured or not to be negligently injured after the landowner has discovered his peril. Autrey v. Roebuck Park Baptist Church, 285 Ala. 76, 229 So.2d 469 (1969).
"Wantonness" has been defined by this court as
 "the conscious doing of some act or the omission of some duty under the knowledge of the existing conditions, and conscious that from the doing of such act or omission of such duty injury will likely or probably result. Britton v. Doehring, 286 Ala. 498, 242 So.2d 666; Westbrook v. Gibbs, 285 Ala. 223, 231 So.2d 97; Tucker v. Cox, 282 Ala. 489, 213 So.2d 222; Culpepper Stone Plumbing Heating Co. v. Turner, 276 Ala. 359, 365, 162 So.2d 455. Wantonness may arise from knowledge that persons, though not seen, are likely to be in a position of danger * * *. Lewis v. Zell, 279 Ala. 33, 181 So.2d 101; Graves v. Wildsmith, 278 Ala. 228, 177 So.2d 448. Wantonness may arise after discovery of actual peril, by conscious failure to use preventive means at hand. Godfrey v. Vinson, 215 Ala. 166, 110 So. 13. Knowledge need not be shown by direct proof but may be shown by adducing facts from which knowledge is a legitimate inference. Britton v. Doehring, supra; Lewis v. Zell, supra." Kilcrease v. Harris, 288 Ala. 245, 251, 259 So.2d 797, 801-02 (1972).
333 So.2d at 131-132.
Thus, if the injured person is found to be a trespasser, the only duty owed to him by the landowner is not to wantonly or intentionally injure him. The duty owed is the same, whether the trespasser is an adult or a child. As stated in AlabamaGreat Southern Railroad Co. v. Green, 276 Ala. 120,159 So.2d 823 (1964):
 Under ordinary conditions trespassing children, or children on the land of another as bare licensees, occupy the same position as trespassing adults. Highland Avenue Belt R. Co. v. Robbins, 124 Ala. 113, 27 So. 422. A landowner is not required to anticipate that children will go where they have no right to be. Sheffield Co. v. Morton, 161 Ala. 153, 49 So. 772.
The duty of one who maintains a power line has been stated as follows:
 "The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith. This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them." Curtis on Law of Electricity, § 510. Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975); Alabama Power Co. v. Smith, 273 Ala. 509, 142 So.2d 228 (1962); Alabama Power Co. v. Irwin, 260 Ala. 673, 72 So.2d 300 (1954). Electric companies are not insurers of the public's safety; and the law does not impose strict liability for all accidents involving *Page 31 
their power lines. Alabama Power Co. v. Tatum, 293 Ala. 500, 306 So.2d 251 (1975); Alabama Power Co. v. Berry, 254 Ala. 228, 48 So.2d 231 (1950).
Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala. 1979).
The Power Company is responsible to trespassers only for a wanton or intentional injury to the trespasser. As stated inAlexander, 370 So.2d at 254, the Power Company must have either actual or constructive notice of the presence of the person who is likely to be injured and "absent this notice, the Power Company [has] no duty to insulate the wires or take precautionary measures unless under the totality of the circumstances, the Power Company should have reasonably anticipated that persons, pursuing business or pleasure, might come in contact with the power lines."
In this case, while there was at least a scintilla of evidence that the Power Company might have had reason to know that people were in the area and might be near the tower, there was no evidence from which a factfinder could infer that the Power Company had any reason to know that people might be climbing the tower. In his deposition, Young Foster stated that the reason he climbed the tower was "to get a better view of the countryside." In Ryckeley v. Georgia Power Company,122 Ga. App. 107, 176 S.E.2d 493 (1970), the Georgia Court of Appeals had the opportunity to consider a fact situation which is very similar to the present case. In Ryckeley, an eleven-year-old boy was killed when he climbed approximately 40 feet up an electrical transmission line tower, came into contact with a high voltage wire, was shocked and fell to the ground. There Georgia Power had knowledge that people had been shooting at the insulators on the tower and had posted a sign, which had rusted and become illegible, that stated "Danger High Voltage, Do Not Shoot at Insulators." The Court stated:
 In the case of a trespasser, liability arises only where the injury has been occasioned by the wilful and wanton negligence of the owner. No duty of anticipating his presence is imposed, even as to an infant trespasser, as was pointed out in Charleston W.C. Ry. Co. v. Johnson, 1 Ga. App. 441, 57 S.E. 1064
and the duty to use ordinary care to avoid injuring him after his presence and danger are actually known, is, in point of fact, merely the duty not to injure him wantonly and wilfully. Cook v. Southern Railway Co., 53 Ga. App. 723, 726, 187 S.E. 274, 277. The evidence in the present case shows that the defendant had actual knowledge that people had been coming into the right of way and had been shooting at the insulators on the tower. The evidence further shows that a sign was put on the tower for the dual purpose of discouraging people from shooting at the tower insulators and to warn that climbing it was dangerous because of the high voltage wires atop it. It could be said that the presence of people had been anticipated. But there is absolutely no evidence that the defendant had any knowledge that people had actually ever been climbing up this tower or, more pertinent, that the defendant had any knowledge of the decedent's presence on the tower which, if so, would have invoked a duty in the defendant not to wilfully or wantonly injure him.
122 Ga. App. at 112, 176 S.E.2d 493.
Plaintiff contends that a material issue of fact was presented on the question whether the Power Company could have reasonably anticipated that plaintiff would climb its transmission line tower. Ordinarily, this would be a fact question, which would preclude entry of a summary judgment.
The trial judge, in an opinion, discussed the evidence submitted by plaintiffs which they contend presented a material question of fact. The trial court opined:
 Plaintiffs have also submitted the affidavit of I.J. Foster, in which he states that there was a road alongside the transmission tower upon which he has observed people traveling in cars, motorcycles and other vehicles; that he has also observed that there was a drive around *Page 32 
the tower itself for a long time and that the surface of the ground indicated a worn way making a roadbed where vehicles had driven around and about the tower. In another affidavit verified by Ida Poole Foster, she states under oath that the transmission tower was a common place for people to go and to park and spend time; that she saw sparks run down the tower to the ground lots of times and on one occasion, her brother, Wayne, sustained an electrical shock just by leaning against the tower.
 None of the statements made in the affidavits alter the fact that Richard did not have permission to climb the transmission tower and was therefore a trespasser rather than an invitee or a licensee at the time he was injured. As the Court noted in its earlier opinion, the only duty owed Richard by Alabama Power Company was not to intentionally or wantonly injure him. Earnest v. Regent Pool, Inc., 288 Ala. 63, 257 So.2d 313 (1972); City of Dothan v. Gulledge, 276 Ala. 433, 165 So.2d 217 (1964).
 Our Supreme Court has acknowledged that it is the duty of an electric company to use reasonable care to keep its wires insulated where it may be reasonably anticipated that persons, pursuing business or pleasure may come in contact with the same. Alabama Power Company v. Mosley, 294 Ala. 394, 318 So.2d 260
(1975); Dwight Mfg. Co. v. Word, 200 Ala. 221, 75 So. 979 (1970). However, in the present case, there is no evidence that Alabama Power should have reasonably anticipated that Richard would climb Alabama Power's electric transmission tower.
Plaintiff essentially argues that the Power Company was under a duty to adopt some means to prevent people from climbing the tower or at least post appropriate warnings so that persons attracted to the tower by curiosity would have some understanding of the danger which would surround them if they attempted to go upon the structure.[1] *Page 33 
Under all the facts presented in connection with the motion for summary judgment, we conclude that the trial judge did not err in granting summary judgment in this case. His judgment is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and SHORES and BEATTY, JJ., concur.
JONES, J., concurs in the result.
[1] There was a sign located on the tower which witnesses testified read: "Danger" and "Do Not Climb." The sign was rusted. The injured boy, at his deposition, testified about the sign:
Q Well, did you see any signs at all.
A I think there's a sign on there.
 MR. HOWARD: Are you talking about before or since this happened that —
A I'm talking about during the time.
 MR. BAKER: I'm talking about before, any time before, I'm not even — like a week before or right before you climbed the tower, did you notice any signs on the tower?
A There's a sign hanging there.
Q Well, did you read that sign?
 MR. HOWARD: He didn't say he saw it before, he said there's one hanging there now, or was. What he's asking you is what you saw before you fell —
 MR. BAKER: What you saw before you climbed — before this accident happened?
 A I — you know, not noticing any signs, you know, like I said, all this come up really —
 Q Well now, I'm just saying — I'm not talking about how well you could read it, did you notice a sign before the accident?
A No, I didn't.
 Q Did you see anything on that tower that looked like it might have been a sign, that had been rubbed out or rusted over, or anything like that?
MR. HOWARD: He's talking about before you fell, young man.
 A Well, I didn't — if I'd noticed one or something like that.
MR. HOWARD: Not what you would have done but —
 MR. BAKER: Did you notice anything that looked like it might have been a sign before the accident?
A No, no, not to catch my sight, no.
Q In other words, you didn't see anything?
A No.
 Q You didn't see any kind of sign right there near the ladder?
A I seen — it would be a sign.
Q There was a sign near the ladder?
 A Right. If it was wrote out, if you could see it better, you could probably — I didn't, like I said —
MR. HOWARD: You didn't see it, did you say?
 A Seen it, maybe glanced at it, I didn't really see it. I'm saying what I said was maybe, you know, look at it over, overlook it because it was nothing to catch your eye, that's what I'm saying.
 MR. BAKER: But you did see something that looked like it might be a sign? You weren't curious as to what that sign might say?
 A Well, it wouldn't, it wasn't visible enough to really read it.
 Q Did you, any attempt to read this sign to try to figure out what it said?
 A No, I made the judgment in my mind to where, you know, thinking the wires and everything would be safe, so I just went up to see what I could see.
 MR. BAKER: You made a judgment in your own mind that those wires were safe, is that correct?
A Yes, sir.
 Q And you couldn't — you didn't read the sign, did you read any part of the sign?
A Not that I can remember.
Q Not even a letter?
 A No. I mean — I'm not saying, I didn't read it at all myself, no.
 Q All right. You just made your own independent judgment those wires above were safe, is that correct?
A Right.
 Q All right. Now, after you saw that sign that you couldn't read, did you climb up the ladder, or climb up the tower?
A Yes.