PER CURIAM.
Mary Johnson sued Hilmer Harris, alleging that he had negligently caused injuries she sustained as she was entering Harris’s mobile home. At the close of the trial, the judge allowed her to orally amend her complaint to allege willful and wanton conduct, but directed a verdict in favor of Harris on the negligence claim. The jury returned a verdict for Harris, and Johnson moved for a J.N.O.V. or, in the alternative, a new trial, which was denied. She appeals from the denial of that motion, arguing that the trial court erred in not allowing her negligence claim to go to the jury.
Johnson broke her ankle when she stepped into a gap between Harris’s mobile home and the steps leading up to it. Johnson testified as follows regarding the accident:
“Q. Okay. Now, before this — when was the last time you had ever been at [Harris’s] house?
“A. I don’t know. I couldn’t tell you the exact date because it was only once before.
“Q. About how many months?
“A. I’d say a year, six or seven months to a year.
“Q. So, it hadn’t been recently?
“A. No.
[[Image here]]
“Q. What happened as you were going into the house?
“A. He went in — he unlocked the door and walked on up and he went in. Then I walked up and I stepped in with my right foot and—
“Q. Then what happened when you stepped in with your right foot?
“A. When I went to put my left foot down, it — instead of — it went down in between the trailer and the steps and I fell in, inside the trailer on the floor.
“Q. Did you feel anything when that happened?
“A. Yeah. My foot was hurting.
“Q. All right. Did you fall forward into the trailer?
“A. Yes.
“Q. Did your left foot stay between the steps and the door as you fell forward?
“A. Yes.
“Q. Now, in your complaint you said you had a broken ankle. Did you have a broken ankle?
“A. Yes.
“Q. Did you have any other bruises or injuries?
“A. Yes. My leg from my knee all the way up to my thigh on the inside of my leg was black and blue from, you know, the scrape of when it went through the steps.
“Q. Now, did you know the gap was there between the steps and the door sill when you went into [Harris’s] house?
“A. No.
“Q. Did [Harris] tell you that it was there?

“A. No.

[[Image here]]
“Q. Mary, on the night that you were injured, was it dark or light?
“A. It was dark.
“Q. Do you remember how the doorway was lit?
“A. There was no light.
“Q. Was there any light coming out of the door?
“A. Yes, after he opened the door. He had switched on the kitchen light and I could see light.
“Q. You never saw the gap that you stepped into, did you?
“A. No.
*1351 “Q. Did you see it after you fell?
“A. Well, yeah, when we pulled my leg out of it, yes.”
(Emphasis added.)
Harris did not contradict Johnson’s account, as his testimony illustrates:
“Q. And where is the light, the [light] outside of your trailer?
“A. Right by the doorway.
“Q. Was the light on or off?
“A. When we were coming in, it was off.
“Q. How about when she started in, once she started in?
“A. As I came in, I unlocked the door. I went in to get a light on and as I turned around, she was there and had stumbled.
[[Image here]]
“Q. Okay. Mr. Harris, you did know the gap was there before the fall?
“A. Yes.
“Q. Okay. Now, as you lived there by yourself, did you, in your daily habits of coming and going, learn to just step over the gap so that you wouldn’t fall in it?
“A. Yes.
[[Image here]]
“Q. Look over there and tell the jury how wide the gap was the night she fell.
“A. My recollection is approximately three to four inches wide.
[[Image here]]
“Q. Have you previously testified to this jury that you turned the outside light on but that you turned the kitchen light on first?
“A. I haven’t said anything about the outside light other than it was there.
“Q. I thought I asked you which of the lights that you turned on first.
“A. You did. I said I turned on the kitchen light.
“Q. Well, did you turn on the outside light?
“A. No, sir, because it was not working.
“Q. It wasn’t working?
“A. No.
“Q. When did you determine, Mr. Harris, that the outside light wasn’t working?
“A. As I recall, it was after — at the time.
“Q. Who have you told that the outside light wasn’t working, including the man that’s asking you the question right now?
“A. I don’t [sic] because — until now — I just assumed that it was out for a while.”
The record establishes that Johnson was a social guest of Harris’s (she went to his mobile home to watch a movie). This Court decided for the first time, in Morgan v. Kirkpatrick, 276 Ala. 7, 168 So.2d 650 (1963), that a social guest is a licensee rather than an invitee. Under these facts, then, Johnson was a licensee.
Approximately four months prior to the decision in Morgan v. Kirkpatrick, supra, this Court stated in W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 600, 165 So.2d 375, 381 (1963), that the duty owed a licensee is “not only to abstain from inflicting intentional, willful or wanton injuries, but to refrain from exposing such licensee to new hidden dangers, such as traps, pitfalls or obstructions which arise through his active negligence.” (Citations omitted; emphasis added.)
Although in Deese v. Espy, 284 Ala. 551, 553, 226 So.2d 332, 333 (1969), this Court stated the standard of care that a landowner owes a licensee as a duty “to refrain from putting traps in his way,” six months later this Court stated in Autry v. Roebuck Park Baptist Church, 285 Ala. 76, 81, 229 So.2d 469, 474 (1969), that “[t]he duty owed a licensee by an owner of premises is not to willfully or wantonly injure him, nor negligently injure the licensee after discovering he [is] in peril.” (Citations omitted.) The rule as stated in Autry has since been followed. See Bryant v. Morley, 406 So.2d 394 (Ala.1981); Ingram v. Akwell Indus *1352 tries, Inc., 406 So.2d 897 (Ala.1981); Foster v. Alabama Power Co., 395 So.2d 27 (Ala.1981); and Hammond v. Realty Leasing, Inc., 342 So.2d 915 (Ala.1977).
A landowner must also not willfully or wantonly injure a trespasser, Foster v. Alabama Power Co., supra. Thus, the distinction between the duty owed a trespasser and the duty owed a licensee is that a landowner must not negligently injure a licensee after discovering his or her peril.
In a case similar to this one, Edwards v. City of Birmingham, 447 So.2d 704 (Ala.1984), this Court affirmed a summary judgment for the City of Birmingham on Wilford Edwards’s complaint alleging that the City had negligently caused the injuries he suffered while playing baseball in one of the City’s public parks. Specifically, Edwards had stepped in a hole on the baseball diamond and his doing so had caused him to fall against the exposed, pointed edges of the fence at the park.
After citing Bryant v. Morley, supra, for the general rule with regard to a landowner’s duty to a licensee, this Court went on to clarify that duty:
“ ‘[A] landowner will generally owe no duty to warn a licensee of a potentially dangerous condition unless he does some positive act which creates a new hidden danger, pitfall or trap [emphasis in original], which is a condition that a person could not avoid by the use of reasonable care and skill. Otherwise, a landowner has the right to make use of his land as he may see fit. The licensee’s entrance on the land carries with it no right to expect the land to be made safe for his reception, but he must assume the risk of whatever may be encountered. Once he is there, the law only requires the landowner to refrain from wantonly, maliciously or intentionally injuring him; in other words, the landowner is not liable unless he does some act which goes beyond mere negligence [emphasis added].’
“Wright v. Alabama Power Co., 355 So.2d 322, 325 (Ala.1978) (citations omitted); Glover v. City of Mobile, 417 So.2d 175 (Ala.1982).”
447 So.2d at 705. Applying that standard to the facts in Edwards v. City of Birmingham, supra, this Court observed that the City had done nothing to create the hole; at the most, it had simply allowed the hole to remain.
We find the facts in Edwards to be strikingly similar to those.in the present case. There is no evidence that Harris actively created the gap between his mobile home and the steps leading up to it. Rather, he had simply allowed the gap to remain over a period of several months. Finally, Harris testified that no one had been injured by the gap prior to Johnson’s accident.
We also note, with regard to a landowner’s duty not to negligently injure a licensee “after discovering his peril,” that the chronology of events here precludes a finding that Harris could have warned Johnson. He did not “discover her peril” until after he had entered the mobile home and turned on the light.
Thus, the trial court correctly directed a verdict for Harris on the negligence count.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES and HOUSTON, JJ., concur.