BRENDA TEMPLAR, as Next Friend of Aja Templar, a Minor, Plaintiff-Appellant, v. DECATUR PUBLIC SCHOOL DISTRICT NO. 61, Defendant-Appellee.

Fourth District   No. 4—88—0593

Opinion filed April 28, 1989.

Kenneth E. Baughman, of Monticello, for appellant.

Samuels, Miller, Schroeder, Jackson & Sly, of Decatur (Nicholas J. Neiers and Martin D. Hoke, of counsel), for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

The circuit court of Macon County granted defendant's motion for directed verdict on the question of wilful and wanton misconduct at the close of plaintiff's case. On appeal, plaintiff argues the circuit court erred in granting the directed verdict and in refusing to allow evidence of two out-of-court statements allegedly made by a principal of the defendant school district.

Aja Templar was a nine-year-old girl in third grade during the 1986-87 school year at Johns Hill Magnet School, Decatur, Illinois. Johns Hill Magnet School, which educates children in kindergarten through the fourth grade, is directly adjacent to Washington School, which educates ESP children. ESP refers to Educational Stabilizing Program and is designed for students whose families move their residences frequently. Both schools accepted students from school buses which dropped them off at the north side of Johns Hill Magnet School on John Street. Approximately 13 buses discharged at this location.

Kenya Sayles is a member of a family which moved frequently throughout the Decatur community. Kenya was in fourth grade at Washington School during the 1986-87 school year. At some point after the 1986 Christmas vacation, Kenya moved into Aja's neighborhood. At that time Kenya, his brothers, and a friend first appeared at Aja's bus stop near her home. The time period concerned here is

the last week, December 1986, to the incident giving rise to the suit February 6, 1987. The school district employees first received complaints on behalf of plaintiff the middle of January 1987.

After Kenya began using the bus stop near Aja's home, incidents between Aja and Kenya began. Alleged incidents included rock throwing, hitting, hair pulling, and name calling. Kenya was also allegedly involved in rock throwing and name calling of Aja and her sisters, and pulling of the girls' hair at the bus discharge area. Aja's twin sister testified that the difficulties occurred on the bus as well, but Aja testified that Kenya did not bother her and her sisters while they rode the bus to school. Kenya had disciplinary problems before moving to his new home in Aja's neighborhood.

Aja's father, Robyrtt Templar, complained to several school officials by telephone concerning the harassment of his daughters. Plaintiff, Aja's mother, claims she listened to the conversations from a speakerphone. The school officials who were telephoned were Mary Polite, the principal of Aja's school, Barry Buttz, the Washington School principal, and Lawrence Reed, defendant's employee in charge of bus pickup points. Mary Polite was also in charge of two teachers who supervised the bus discharge area, Muriel Sumpter and John Henry.

The telephone calls allegedly made by Robyrtt include the following. On January 14, 1987, Robyrtt telephoned Reed, told him the problem his daughters were experiencing with Kenya and his brothers, and complained that the Sayles boys should not be let off the bus at the point where the Templar girls waited until their school doors were opened in the morning. On January 21, Robyrtt telephoned Buttz and told him that Kenya had slapped, shoved, hit, and threw snowballs at Aja and her sisters on school property. Robyrtt telephoned Polite on January 29 and complained about the same incidents that he spoke to Buttz about. Robyrtt telephoned Buttz again on February 5 and claimed the harassment by Kenya had not stopped. That same day Robyrtt telephoned Reed, explained the problem to him again, and complained that the problem had not changed since their first conversation.

Buttz testified that the first conversation with Robyrtt concerned only verbal harassment by Kenya. Buttz also said that after his first conversation with Robyrtt in late January he called Kenya and the other boys involved in the incidents to his office to talk to them about the problem. Buttz stated that it was not within his area of responsibility to control bus drop-off and pickup points at his school. Buttz also stated he did not tell Robyrtt that he had done all he

could do about the problems experienced by the Templar girls, contrary to plaintiff's claim. Buttz further stated that in his second telephone conversation with Robyrtt, Kenya was not specifically identified as the source of any problem. Buttz finally stated that after the telephone conversations he had with Robyrtt, he discussed the matter with Larry Reed in an effort to eliminate the problem. The bus stop for Kenya was changed on February 5 so that he would not wait for the bus with Aja and her sisters. In addition, the bus driver was instructed to keep Kenya and his brothers off the bus if they were not at their proper bus stop.

As Aja waited in front of her school for the doors to open on February 6, Kenya hit her in the right eye with his fist with sufficient force that knocked her to the ground. According to the testimony of Aja's twin sister, Kenya muttered something to the effect that he hit Aja in the eye because she caused the change of his bus pickup point. John Henry testified that the school did not notify him of the problem between Kenya and the Templar girls. Muriel Sumpter also testified that she was not informed of the problems between Kenya and Aja.

As a result of her injury, Aja lost partial vision in her right eye caused by a blind spot in the central viewing area. Dr. John Randolph of the Gailey Eye Clinic in Bloomington testified that this condition was permanent and that it might have been caused by the hit from Kenya on February 6, 1987.

At the close of plaintiff's evidence, defendant presented a motion for a directed verdict, claiming plaintiff failed to present any facts which could show the defendant school district was guilty of wilful and wanton misconduct. The circuit court granted defendant's motion.

Plaintiff alleged in her post-trial motion, filed on June 27, 1988, that the trial court misapplied the rule for wilful and wanton misconduct to the facts of her case. The post-trial motion also alleged that the court erred by refusing to allow into evidence the telephone conversations between Robyrtt and Buttz where plaintiff claims Buttz stated there was nothing he could do to alleviate the problem experienced by the Templar girls. The circuit court denied the post-trial motion on August 12, 1988, and notice of appeal was filed that same day.

■ The standard governing defendant's motion for a directed verdict is set forth in *Pedrick v. Peoria & Eastern Ry. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14. Our supreme court stated that verdicts should be directed only where all the evidence,

when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.) The *Pedrick* court also stated that a verdict may be directed even though some slight evidence to the contrary exists. (*Pedrick*, 37 Ill. 2d at 505, 229 N.E.2d at 510.) Furthermore, the trial judge must view the evidence in its light most favorable to the nonmovant but need not accept all of the nonmovant's evidence as true when deciding whether there is any credible evidence to allow the case to go to the jury. *Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 712, 313 N.E.2d 631, 635.

■■ ■ Of importance to this case is section 24—24 of the School Code (Ill. Rev. Stat. 1987, ch. 122, par. 24—24), which states in pertinent part:

> "Teachers and other certificated educational employees shall maintain discipline in the schools, including school grounds which are owned or leased by the board and used for school purposes and activities. In all matters relating to the discipline in and conduct of the schools and the school children, they stand in the relation of parents and guardians to the pupils. This relationship shall extend to all activities connected with the school program *** and may be exercised at any time for the safety and supervision of the pupils in the absence of their parents or guardians."

Our supreme court has interpreted section 24—24 to confer upon educators the status of *in loco parentis* in nondisciplinary and disciplinary matters; therefore, teachers should not be subjected to any greater liability than parents, who are liable to their children for wilful and wanton misconduct but are not liable for mere negligence. (*O'Brien v. Township High School District 214* (1980), 83 Ill. 2d 462, 466-67, 415 N.E.2d 1015, 1017.) The supreme court has defined an injury which results from wilful and wanton conduct as one that is the result of conduct which is either intentional or committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent the injury or a failure to discover the danger through recklessness or carelessness when it could have been discovered by ordinary care. *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 429, 412 N.E.2d 447, 457.

■ This court decided a case similar to the one before us in *Holsapple v. Casey Community Unit School District C-1* (1987), 157

Ill. App. 3d 391, 510 N.E.2d 499. In *Holsapple,* we concluded that allegations of a failure to supervise student activities are not sufficient to state a cause of action for wilful and wanton misconduct. A showing of actual or constructive notice of a high probability of serious harm occurring is necessary to state a cause of action for wilful and wanton misconduct. *Holsapple,* 157 Ill. App. 3d at 393, 510 N.E.2d at 500.

The holding that a school district's failure to provide supervision rises to a level of wilful and wanton misconduct where the defendant had actual or constructive knowledge of a high probability of serious physical harm occurring was also the conclusion reached in several other cases, including *Albers, Weiss v. Collinsville Community Unit School District No. 10* (1983), 119 Ill. App. 3d 68, 456 N.E.2d 614, and *Pomrehn v. Crete-Monee High School District* (1981), 101 Ill. App. 3d 331, 427 N.E.2d 1387. Plaintiff states that this finding should be disregarded as misstating the law as indicated in *O'Brien* and in the Restatement (Second) of Torts. *Holsapple, Albers, Weiss,* and *Pomrehn* do not conflict with *O'Brien,* they merely clarify the definition of wilful and wanton misconduct. The Restatement (Second) of Torts section which plaintiff refers to is section 316, which states:

"Duty of Parent to Control Conduct of Child

A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent

(a) knows or has reason to know that he has the ability to control his child, and

(b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts §316, at 123-24 (1965).

Plaintiff claims section 316 is an exception to the general rule that parents are not liable for the torts of their children merely because of their relationship. Plaintiff contends *Williams v. McCoy* (1987), 152 Ill. App. 3d 912, 505 N.E.2d 46, accepts the section 316 exception in Illinois. Plaintiff's contention is not accurate. In *Williams,* the court found that section 316 did not apply to the facts of that case, and it did not decide whether section 316 is accepted in Illinois. (*Williams,* 152 Ill. App. 3d at 914, 505 N.E.2d at 48.) We conclude that any section 316 exception, if it even exists in Illinois, is not applicable to the facts of the case before us.

Plaintiff urges us to follow the holding in *Gammon v. Edwards-*

*ville Community Unit School District No. 7* (1980), 82 Ill. App. 3d 586, 403 N.E.2d 43, where the court found that supervision necessary to avoid a confrontation was not provided when the school district had knowledge of prior misconduct by the offending student. *Gammon* is easily distinguished from the case before us because here the school district made efforts to alleviate the problem between plaintiff and the offending student.

Plaintiff urges us to follow the holding in *Goka v. Bobbitt* (7th Cir. 1988), 862 F.2d 646. *Goka,* unlike this case, involved a constitutional question. Additionally, *Goka* was in the Federal forum involving a Federal question. The school district did not ignore the complaints. From the time of Robyrtt's first telephone call, January 14, 1987, to the school district to February 6, 1987, the district did take action. Kenya was called into the office concerning the problem, and on February 5, 1987, Kenya's pickup point was changed in an effort to resolve the difficulty. The trial court's finding there was no wilful and wanton misconduct was correct.

■ In summary, we find no evidence of wilful and wanton misconduct by defendant which could support a verdict for plaintiff. Therefore, we find, according to *Pedrick,* that after considering all the evidence in its aspect most favorable to plaintiff, it so overwhelmingly favors defendant that no contrary verdict based on the evidence could ever stand.

We turn now to plaintiff's contention that the trial court improperly refused to allow evidence of two out-of-court statements allegedly made by a principal of the defendant school district. During the trial, plaintiff's counsel asked plaintiff on direct examination whether she overheard a telephone conversation between Robyrtt and principal Buttz. Defendant's counsel objected and the court sustained the objection. Plaintiff's counsel then presented an offer of proof in which plaintiff stated Buttz told Robyrtt "there was really nothing he could do" in relation to the problem between Kenya and the Templar girls. In addition, plaintiff stated that she overheard a second telephone conversation during which Buttz indicated to Robyrtt "there wasn't anything more he could do," referring again to the problem between Kenya and the Templar girls. Plaintiff's counsel also presented an offer of proof in which he claimed Robyrtt would testify to the same statements allegedly made by Buttz which plaintiff testified to in the previous offer of proof. The court then instructed plaintiff's counsel to avoid the conversations Robyrtt engaged in with Buttz.

Plaintiff's counsel called Buttz as an adverse witness and asked

Buttz whether he told Robyrtt during a telephone conversation on January 21, 1987, that there was nothing he could do to help Robyrtt with his problem. Buttz answered: "No, not at all." Plaintiff's counsel then asked Buttz whether he told Robyrtt on January 21, 1987, that he had done all he could do with Kenya. Buttz answered: "No, sir." Plaintiff's counsel also asked Buttz whether he told Robyrtt during a telephone conversation on February 5, 1987, that there was nothing he could do to help Robyrtt with his problem. Buttz answered: "I do not recall making that statement." Finally, plaintiff's counsel asked Buttz whether he told Robyrtt on February 5, 1987, that he had done all he could do with Kenya. Buttz answered: "I do not recall making that statement, sir."

Robyrtt was called later to impeach Buttz' previous testimony. Plaintiff's counsel asked Robyrtt whether Buttz told him during a telephone conversation on February 5, 1987, what he could do for Robyrtt. Robyrtt answered: "Yes, he told me specifically that there was nothing he could do."

■ The parties argue the correctness of the trial court's ruling on the basis of hearsay. Hearsay is "an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter." (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223, 226.) Equally obvious, testimony introduced for a purpose other than to prove the truth of the matter asserted is admissible. (*People v. Canity* (1981), 100 Ill. App. 3d 135, 151, 426 N.E.2d 591, 602-03.) Plaintiff argues that the hearsay statements allegedly made by Buttz fall into one of three exceptions to the hearsay rule: as knowledge on the part of the defendant's supervising agents, or state of mind; as an admission; or as part of the *res gestae*.

We question the issue as being one of hearsay.

■ The plaintiff was called to testify before Buttz. The objections to plaintiff's testimony and the offers of proof followed. Buttz was then called as an adverse witness. Robyrtt's impeachment testimony followed. The record does not show plaintiff sought to also testify in impeachment. The testimony concerned telephone communications between Robyrtt and Buttz; plaintiff was in a position to hear the conversation of both. The trial court's rulings as to the testimony of plaintiff and Robyrtt on this matter was incorrect. The trial court did allow Robyrtt to testify as to the conversation, mooting the trial court's original ruling as to his testimony. Plaintiff should have been allowed to testify but any trial court error was harmless.

Exclusion of admissible evidence is harmless error if substantial

rights are not affected by its exclusion. (107 Ill. 2d R. 615(a); *Dayan v. Dayan* (1967), 86 Ill. App. 2d 358, 229 N.E.2d 568.) The evidence for the directed verdict is overwhelming, and the trial court's ruling on Buttz' statements does not affect substantial rights of the plaintiff and amounts to harmless error.

For the above reasons, we affirm the circuit court's order which granted defendant's directed verdict.

Affirmed.

KNECHT and SPITZ, JJ., concur.