MICHAEL J. MILLER, Plaintiff-Appellee, v. GENERAL MOTORS CORPORATION, Defendant-Appellant.

Fourth District No. 4—90—0127

Opinion filed December 6, 1990.—Rehearing denied February 6, 1991.

150

John E. Muench and James C. Schroeder, both of Mayer, Brown & Platt, of Chicago, Everett L. Laury, of Hutton, Laury, Hesser, Lietz & Wilcox, of Danville, and Charles E. Fairfax III, of General Motors Corporation, of Detroit, for appellant.

Edward J. Kionka, of Carbondale, and Warren E. White, of Danville, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

Plaintiff, Michael J. Miller, filed a two-count complaint against defendant, General Motors, alleging both negligence (count I) and wilful and wanton misconduct (count II) based upon injuries plaintiff suffered to his right hand. These injuries occurred when plaintiff touched a live wire approximately 13 feet off the ground while trespassing on defendant's property. The jury returned a verdict for plaintiff on both

counts, awarding him $2 million in compensatory damages and $1.5 million in punitive damages. However, the jury also found plaintiff to be 25% contributorily negligent. Accordingly, compensatory damages were then reduced to $1.5 million.

On appeal, defendant argues that the judgment entered against it on both counts I and II should be reversed because (1) based on the limited duty defendant owed plaintiff (a) count I should have never been submitted to the jury, and (b) the trial court should have granted its motion for judgment *n.o.v.* because plaintiff did not sustain his burden of proving wilful and wanton misconduct by defendant; (2) the trial court erred because no aggravating factors were shown that could justify an award of punitive damages; (3) in the alternative, the $1.5 million award of punitive damages should be reduced because it is totally disproportionate to defendant's culpability; (4) the punitive damages award violated due process because the jury was given no standard with which to calculate the award; and (5) the trial court erred in excluding evidence of plaintiff's drinking and in admitting evidence of defendant's wealth.

We reverse.

## I. Facts

### A. The Pumphouse

Defendant operates a foundry on land it owns near the Vermilion River, southwest of Danville, Illinois. Along the river is a massive pumphouse, built in the 1950's, that defendant uses to extract large amounts of water from the river for use in its foundry, located approximately one-half mile south of the river. To operate the pumps, overhead electrical lines enter the pumphouse from the south and connect to several electrical transformers located in an enclosed, elevated balcony. The pumps do not run constantly, but only when the water level of the reservoir drops to a certain point.

The balcony area, located on the south side of the pumphouse, is almost 10 feet off the ground and is surrounded by a steel shroud. This second-story balcony contains three electrical transformers which sit on an elevated platform approximately three feet above the balcony floor, which is constructed of wooden slats with gaps between them. These transformers, and several bare wires that feed into them, carry approximately 4,160 volts of electricity. The balcony, which extends out from the pumphouse, is enclosed by four walls, but only has a partial roof. Directly beneath the balcony is a locked door, leading to a room in the pumphouse, in which a ladder is kept. On occasion,

defendant's employees use this ladder to gain access to the balcony by way of an overhead gap, 12 by 20 inches wide, located in the floor of the balcony.

In the 35 years since the pumphouse was built, no electrical contact accidents have occurred except for the incident in the present case. Evidence presented at trial showed that people occasionally trespassed in the general vicinity of the pumphouse, but no evidence showed that defendant had knowledge of any previous attempts by a trespasser to scale the pumphouse's wall and crawl through the gap in the floor of the balcony. Several of defendant's security officers testified at trial that whenever they discovered a trespasser on *any* portion of defendant's property, they promptly told the individual to leave the premises.

At the time of plaintiff's accident, the pumphouse did not have any warning signs, the paint on the pumphouse was peeling, and the fences surrounding the pumphouse on the river side had fallen into disrepair. In earlier years, warning signs had been posted on the fence gate, the pumphouse, and near the river's edge. At trial, plaintiff made much of the issue that the condition of the pumphouse and its surrounding area violated the National Electric Code and the National Electrical Safety Code.

### B. The Accident

On June 13, 1984, plaintiff (then 20 years old) and Charles Boswell (then 19 years old) began a canoe trip down the Vermilion River. They canoed the river until nightfall, when they stopped to camp under a railroad trestle that crossed the river.

The next morning, plaintiff and Boswell decided to explore some of the river they had passed the night before. The day was sunny. Their first stop was the pumphouse.

The two paddled their canoe to the river bank and docked alongside a platform at the base of the pumphouse. Plaintiff and Boswell admitted at trial that they were trespassers and did not have defendant's permission to enter the property. Neither had seen the pumphouse before and did not know what it was. They thought it was an old abandoned structure. As soon as they docked, plaintiff got out of the canoe and quickly ran up some stairs located along the east side of the pumphouse. When Boswell reached the top of the stairs, plaintiff was already on the roof of the pumphouse. After jumping off the roof, plaintiff saw the lock on the pumphouse door and a fence with a closed and locked double gate, topped with barbed wire, in front of the pumphouse. A dirt road led southward from the gate. Neither

plaintiff nor Boswell tried to open the gate or cross the fence. Plaintiff testified at trial that they thought they were on the outside looking in. Plaintiff then looked up through the gap in the balcony floor. He testified that, from below, the balcony was dark except for rays of light that came in through the partial roof. Plaintiff testified that he climbed up into the balcony to see what was there because he was curious.

Plaintiff gained access to the balcony by scaling a nine-foot wall with the aid of a pipe and some eyebolts sticking out of the wall. He then crawled through the 12- by 20-inch gap in the floor of the balcony and circumvented a ledge sticking out 8 to 10 inches from the top of the wall. After climbing into the balcony, plaintiff grabbed a live electrical wire in order to pull himself up. The wire on which plaintiff severely injured his hand was approximately 13 feet off the ground.

Plaintiff testified that before the accident he saw barrels and cables in the balcony, although his visibility was poor. Plaintiff admitted that he had previously seen transformers on utility poles, but he had never heard of them referred to as transformers. Plaintiff and Boswell testified that they did not see the three overhead transmission lines coming from the hill to the south, nor did they hear any noises coming from the balcony area.

After the accident, Boswell helped plaintiff climb down from the balcony. The two walked down the stairs to the canoe, paddled the river a short distance, and obtained a ride to the hospital. Plaintiff spent several painful weeks in the hospital and had a series of operations on his hand. As a result of the accident, plaintiff's hand is disfigured. He lost the little finger of his right hand and some dexterity in his other fingers. Also, his hand is not as strong as it was before the accident.

## II. ANALYSIS

Before this court can address the primary issue defendant raises on appeal—whether the circuit court erred by denying defendant's post-trial motion for judgment *n.o.v.*—we must first determine what duty was owed by defendant to plaintiff on the facts of this case. Whether a duty exists in the first instance is a question of law. *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226.

### A. General Principles of Duty Owed to a Trespasser

■ It is well settled that the liability of an owner or occupier of land (landowner) has been set in terms of duty. Those who enter upon

land are generally divided into three fixed categories—trespassers, licensees, and invitees—and the landowner has specific duties regarding persons within each category. These three categories constitute a sliding scale, and, as the legal status of the "visitor" improves from trespasser to licensee to invitee, the landowner owes that "visitor" more protection. See W. Keeton, Prosser & Keeton on Torts §58, at 393 (5th ed. 1984).

 █ The lowest point on the "legal-duty-owed" scale is the trespasser, defined as a person who enters or remains upon land in the possession of another without a privilege to do so. (Restatement (Second) of Torts §329 (1965); *Wymer v. Holmes* (1987), 429 Mich. 66, 412 N.W.2d 213; *Mendoza v. City of Corpus Christi* (Tex. Ct. App. 1985), 700 S.W.2d 652.) Because the landowner has a legally protected interest in the exclusiveness of his possession, no one has any general right to enter that land without his consent. (Restatement (Second) of Torts §329 (1965).) Additionally, because a landowner is free to fix his own terms for consent, an "intruder" who comes on the possessor's land without his permission has no right to demand that the possessor provide him with a safe place to trespass, or that the possessor protect him in his wrongful use of the possessor's property. (Restatement (Second) of Torts §329 (1965).) When the "intruder" enters where he has no right or privilege to go, he assumes both the responsibility for his own safety and the risk of what he may encounter. (*Sheehan v. St. Paul & D. Ry. Co.* (7th Cir. 1896), 76 F. 201.) Accordingly, the general rule, subject to several qualifications, is that a landowner is not liable for injury to a trespasser caused by the landowner's failure to exercise reasonable care to put his land in a safe condition for the trespasser, or to carry on his activities in a manner which does not endanger the trespasser. Restatement (Second) of Torts §333 (1965); *Savinsky v. Bromley Group, Ltd.* (N.M. Ct. App. 1987), 106 N.M. 175, 740 P.2d 1159; see also W. Keeton, Prosser & Keeton on Torts §58, at 393 (5th ed. 1984).

The reasons for this landowner immunity are varied. Some courts reason that the presence of a trespasser is not to be anticipated, and hence a reasonable person does not need to take steps to protect that trespasser. (*Hume v. Hart* (1952), 109 Cal. App. 2d 614, 241 P.2d 25.) In many cases, this is no doubt true; however, while it is common knowledge that people do trespass upon the land of others, in most jurisdictions, the foreseeability of such general trespassing is said to impose no obligation. (Restatement (Second) of Torts §333 (1965); *Rowland v. Byrd* (1938), 57 Ga. App. 390, 195 S.E. 458.) Some courts reason that the landowner owes no duty to a trespasser because a

trespasser is a wrongdoer and may not recover for the consequences of his own wrong. (*Denton v. L.W. Vail Co.* (1975), 23 Or. App. 28, 541 P.2d 511.) Other courts have suggested that it is a socially desirable policy to allow a person to use his own land in his own way without the burden of watching or protecting those who come onto that land without permission or right. *McPheters v. Loomis* (1939), 125 Conn. 526, 7 A.2d 437; see also W. Keeton, Prosser & Keeton on Torts §58, at 395 (5th ed. 1984).

From the general rule of nonliability of a landowner to a trespasser, the rest of the law regarding trespassers is a list of exceptions. These exceptions have developed because of the concern that human safety ought to be more important than the landowner's interest in unrestricted freedom to use his own land as he sees fit. This view is especially prevalent in cases in which the burden on the landowner and the expense in taking precautions to prevent harm are not great. (See *Ward*, 136 Ill. 2d at 142-43, 554 N.E.2d at 226-27.) If that burden is very slight, and if the risk of harm to the trespasser is correspondingly very great, some commentators have found good reason to hold the landowner liable for injuries sustained on his land by the trespasser. This rule applies mostly in the case of frequent trespass upon a limited area. See W. Keeton, Prosser & Keeton on Torts §58, at 395-96 (5th ed. 1984).

### 1. *Frequent Trespassers on a Limited Area*
■ When a landowner knows, or should know from facts within his knowledge, that trespassers are in the habit of entering his land at a particular point or of traversing an area of small size, many courts hold that there is a duty of reasonable care to discover and protect trespassers in the course of the landowner's activities. (Restatement (Second) of Torts §334 (1965).) This duty is imposed because the burden of looking out for trespassers is not great. A typical case is the frequent use of a "beaten path" that crosses a railroad track, which is held to impose a duty of reasonable care as to the operation of trains. (*Southern Ry. Co. v. Campbell* (5th Cir. 1962), 309 F.2d 569.) In only a few cases have courts imposed a similar duty as to dangerous, passive conditions known to landowners, such as concealed high-tension wires. (Restatement (Second) of Torts §335 (1965); *Franc v. Pennsylvania R.R. Co.* (1967), 424 Pa. 99, 225 A.2d 528.) Liability has been extended in such cases because the landowner's continued toleration of the trespass amounts to permission to make use of the land, so that the plaintiff is not a trespasser but a licensee. (*Mentesana v. LaFranco* (1979), 73 Ill. App. 3d 204, 391 N.E.2d 416.)

While it is true that a failure to object may amount to tacit permission, the mere fact the landowner does not take burdensome and expensive precautions to keep trespassers out, which may well be futile, should not in itself indicate that he is willing to have them enter. (*Mentesana*, 73 Ill. App. 3d at 208, 391 N.E.2d at 419.) The real basis of liability to such "tolerated intruders" would seem to be only the ordinary duty to protect another, where the harm to be anticipated from a risk for which the defendant is responsible outweighs the inconvenience of guarding against it. See W. Keeton, Prosser & Keeton on Torts §58, at 396 (5th ed. 1984).

### 2. Discovered Trespassers

■ Another important exception to the trespasser rule is the requirement that the landowner exercise reasonable care for a trespasser's safety once his presence is known. This rule evolved from the older rule that a possessor of land was not free to inflict unreasonable intentional injury upon his unwelcome visitor. A trespasser, while he may be a wrongdoer, is not an outlaw, and an intentional, unprivileged battery upon him is not tolerated. (*Schofield v. Merrill* (1982), 386 Mass. 244, 435 N.E.2d 339.) A landowner is not permitted to set traps for the trespasser or to use unreasonable force to expel him from the premises. (*Bennett v. Public Service Co.* (1st Cir. 1976), 542 F.2d 92; *Katko v. Briney* (Iowa 1971), 183 N.W.2d 657.) Nor is he allowed to injure the trespasser negligently by an act specifically directed toward him, or recklessly by conduct in conscious disregard of his peril. (*Bremer v. Lake Erie & Western R.R. Co.* (1925), 318 Ill. 11, 148 N.E. 862.) Thus, the rule which has evolved, whether the trespasser has been discovered or not, is that the landowner owes no duty to a trespasser except to refrain from injuring him by wilful or wanton conduct. *Votava v. Material Service Corp.* (1979), 74 Ill. App. 3d 208, 392 N.E.2d 768; see also W. Keeton, Prosser & Keeton on Torts §58, at 397 (5th ed. 1984).

Some courts have stopped at this point, and have refused to find that the landowner owes any duty to the trespasser, even after his presence is known, unless wilful or wanton conduct is found. (*Earnest v. Regent Pool, Inc.* (1972), 288 Ala. 63, 257 So. 2d 313; *Hughes v. Star Homes, Inc.* (Miss. 1980), 379 So. 2d 301.) Other courts have retreated from this position by the expedient of defining wilful or wanton to include any failure to use ordinary care after the trespasser is discovered. (*Frederick v. Philadelphia Rapid Transit Co.* (1940), 337 Pa. 136, 10 A.2d 576.) A few courts have discarded wilful or wanton entirely as a limitation, and have said outright that once the presence

of the trespasser is discovered, there is a duty to use ordinary care to avoid injuring him. The landowner is thereupon required to govern his active conduct, such as running a train (*Denver & Rio Grande Western R.R. Co. v. Clint* (10th Cir. 1956), 235 F.2d 445), conducting a circus (*Herrick v. Wixom* (1899), 121 Mich. 384, 81 N.W. 333), or operating an elevator (*Pridgen v. Boston Housing Authority* (1974), 364 Mass. 696, 308 N.E.2d 467), with the caution of a reasonable person for the trespasser's safety. See W. Keeton, Prosser & Keeton on Torts §58, at 397 (5th ed. 1984).

Usually, the discovered trespasser is owed the higher duty when he is perceived to be in a situation of peril or possible danger, even if the landowner is aware that he is a trespasser. (See *Logan v. Old Enterprise Farms, Ltd.* (1990), 139 Ill. 2d 229, 236.) However, it is not essential that his presence actually be perceived by the landowner. It is enough that the landowner has received information which would lead a reasonable person to conclude that a trespasser is present. *Frederick*, 337 Pa. 136, 10 A.2d 576; *Lavallee v. Pratt* (1960), 122 Vt. 90, 166 A.2d 195; see also W. Keeton, Prosser & Keeton on Torts §58, at 398 (5th ed. 1984).

For a long time it was uncertain whether the duty owed to the discovered trespasser extends to warning or otherwise protecting him against a purely passive condition of the premises. Courts have held that there was no more of an obligation to rescue the trespasser from personal injury than to rescue any other stranger. (*Buch v. Amory Manufacturing Co.* (1898), 69 N.H. 257, 44 A. 809; *Carroll v. Spencer* (1954), 204 Md. 387, 104 A.2d 628.) However, the Restatement (Second) of Torts and some courts have disagreed, holding that possession of the land carries with it the duty to see that artificial and dangerous conditions do not become instruments of harm to others, and holding further that the discovery of the danger makes reasonable the requirement of a warning. (Restatement (Second) of Torts §337 (1965); *Appling v. Stuck* (Iowa 1969), 164 N.W.2d 810; *Nolan v. Roberts* (Fla. Dist. Ct. App. 1980), 383 So. 2d 945; *Gaylord Container Corp. v. Miley* (5th Cir. 1956), 230 F.2d 177.) Many courts now hold that the landowner has a duty of care to the discovered trespasser at least in his active conduct, including the operation of his machinery, and it is now frequently stated as a general principle that the landowner has a duty to warn of hidden dangers known to the landowner but not to the trespasser. *Bovino v. Metropolitan Dade County* (Fla. Dist. Ct. App. 1979), 378 So. 2d 50; *Nolan*, 383 So. 2d 945; *Joyce v. Nash* (Mo. Ct. App. 1982), 630 S.W.2d 219; see also W. Keeton, Prosser & Keeton on Torts §58, at 398-99 (5th ed. 1984).

This duty is, of course, only to exercise reasonable care under the circumstances. Thus, the engineer of a train who discovers a trespasser ahead on the track may ordinarily assume that he is in possession of his faculties and that after proper warning he will remove himself to safety. (*Lawrence v. Bamberger R.R. Co.* (1955), 3 Utah 2d 247, 282 P.2d 335.) It is only when it becomes apparent that he is insensible or helpless, or that the warning has not been heard, that something more than a whistle is required. *Chicago Terminal Transfer R.R. Co. v. Kotoski* (1902), 199 Ill. 383, 65 N.E. 350; see also W. Keeton, Prosser & Keeton on Torts §58, at 399 (5th ed. 1984).

### B. Illinois Common Law Duty to Trespasser

■ The limited duty owed by a landowner to a trespasser is well established in Illinois. The law does not require a landowner to assume that a trespasser will expose himself to injury on the landowner's property. (*Merlo v. Public Service Co.* (1942), 381 Ill. 300, 314, 45 N.E.2d 665, 674.) Nor is a landowner required to keep his land in any particular state or condition to promote the safety of trespassers. (*Hessler v. Cole* (1972), 7 Ill. App. 3d 902, 905, 289 N.E.2d 204, 206.) A landowner owes only the duty not to wilfully and wantonly injure the trespasser. (*Sumner v. Hebenstreit* (1988), 167 Ill. App. 3d 881, 885, 522 N.E.2d 343, 345.) This common law duty of a landowner to a trespasser is expressly preserved in section 3 of the Premises Liability Act (Ill. Rev. Stat. 1987, ch. 80, par. 303). A landowner's duty is modified, however, when a trespasser is reasonably anticipated or discovered in a place of danger. In that situation, the landowner owes the discovered trespasser a duty of ordinary care. *Eaton v. Baltimore & Ohio R.R. Co.* (1990), 198 Ill. App. 3d 137, 140, 555 N.E.2d 790, 791; *Sumner*, 167 Ill. App. 3d at 885, 522 N.E.2d at 345.

■ Plaintiff urges this court to disregard this limited common law duty and adopt a more stringent approach to the circumstances of this case because of the danger associated with the use and transmittal of electricity. However, we decline plaintiff's invitation to do so, as other courts have declined similar invitations. (*Merritt v. Bethlehem Steel Corp.* (7th Cir. 1989), 875 F.2d 603; *Ryckeley v. Georgia Power Co.* (1970), 122 Ga. App. 107, 176 S.E.2d 493.) Even though the use and transmittal of electricity is dangerous, it is a passive condition on the land, and the courts of this State have consistently found that a landowner owes only a duty to refrain from wilful and wanton misconduct in these circumstances. *Lee v. Chicago Transit Authority* (1990), 205 Ill. App. 3d 163, 169.

Recently, in *Lee*, the First District Appellate Court found that a defendant landowner did not engage in the affirmative activity of distributing electricity despite the fact that it owned and operated transformers. (*Lee*, 205 Ill. App. 3d at 173.) The court then stated that a landowner does not become a utility simply because it uses or redistributes electricity. (*Lee*, 205 Ill. App. 3d at 173.) Even a utility has a duty of ordinary care to insulate its power lines only to the extent that those lines are in a place where a person has a right to be. (*Lee*, 205 Ill. App. 3d at 173.) Therefore, a utility, like any other landowner, has a duty of ordinary care when engaged in an affirmative activity *and* when it knows or should have known of the presence of the trespasser. (*Lee*, 205 Ill. App. 3d at 173-74.) Thus, in determining the duty defendant owed plaintiff in the present case, our analysis remains centered on whether defendant should have reasonably anticipated or discovered plaintiff in a place of danger.

### C. Whether Defendant Should Have Reasonably Anticipated or Discovered Plaintiff In a Place of Danger

On the subject of trespassers, the record contains the following testimony:

"Q. [Plaintiff's attorney:] General Motors, prior to June 14, 1984, knew that trespassers frequented the pumphouse. Is that correct?

A. [Ms. Foster:] We knew that people sort of liked hanging around the Arches, going down the river.

Q. And they would come up here, and they would mess around, screw around. Possibly that's how the fence got in the condition that it was?

A. I don't know.

Q. But you did have problems with trespassers down there. Is that correct?

A. I haven't had problems with trespassers. I heard of them having problems.

Q. And this was prior to June 14, 1984?

A. Yes.

Q. Do you know of any special precautions that General Motors took to prevent entry by trespassers there at the pumphouse?

A. All I could think was the gate being locked, and then a door inside there being locked, that was taking extra precaution. And then, the added fence being there.

\* \* \*

Q. [Defendant's attorney:] Have you, yourself, from 1984 or '78, I believe you said, to 19 say '84, have you inspected the pumphouse area how many times?

A. [Ms. Foster:] Maybe once a month.

Q. Did you ever see trespassers in or about the pumphouse area?

A. No.

Q. Have you ever known any trespassers to go up into the balcony area?

A. I have never known it.

* * *

Q. [Defendant's attorney:] Did you ever see any trespassers down there?

A. [Ms. Foster:] No.

Q. In all the time you went down there?

A. (Witness nodding negatively)."

Boswell, plaintiff's companion on the day in question, testified as follows:

"Q. [Defendant's attorney:] I assume you had never been in the area of the pumphouse before?

A. [Mr. Boswell:] No.

Q. Never canoed down that particular part of the river before?

A. No."

Other evidence presented on this subject included two area residents who testified that they had canoed the river a number of times. One resident stated that he had stopped and explored the pumphouse grounds, but did not state whether he had actually explored the pumphouse itself. The other resident never explored the structure. No evidence was presented that defendant knew of these two trespassers.

Plaintiff's assertion that defendant knew that trespassers would likely scale the nine-foot wall and climb into the second-story balcony rests on the propositions that the pumphouse was an open invitation to adventurers and that curiosity would induce the adventuresome to explore it. From the evidence that showed occasional trespassers in the general vicinity of the pumphouse, plaintiff jumps to the conclusion that defendant should have reasonably anticipated that someone would actually scale a nine-foot wall using eyebolts, crawl through a small opening in the ceiling, and explore an elevated, enclosed balcony. We disagree.

■ After reviewing the evidence presented at trial on this issue,

we find that defendant had no reason to anticipate that a trespasser would do what the plaintiff has done. Courts in this State and other jurisdictions have routinely held that landowners need not anticipate that an isolated trespasser will climb into an area of electrical danger. (See *Celner v. Central Illinois Electric & Gas Co.* (1951), 343 Ill. App. 310, 99 N.E.2d 214; *Austin v. Public Service Co.* (1921), 299 Ill. 112, 132 N.E. 458; *Gherra v. Central Illinois Public Service Co.* (1918), 212 Ill. App. 48; *Rodriguez v. Schlittenhart* (Ariz. Ct. App. 1989), 161 Ariz. 609, 780 P.2d 442; *Foster v. Alabama Power Co.* (Ala. 1981), 395 So. 2d 27; *Bennett*, 542 F.2d 92; *Glastris v. Union Electric Co.* (Mo. Ct. App. 1976), 542 S.W.2d 65; *Ryckeley*, 122 Ga. App. 107, 176 S.E.2d 493; *Ross v. Sequatchie Valley Electric Cooperative* (1955), 198 Tenn. 638, 281 S.W.2d 646; *Caraglio v. Frontier Power Co.* (10th Cir. 1951), 192 F.2d 175; *Gouger v. Tennessee Valley Authority* (1949), 188 Tenn. 96, 216 S.W.2d 739.) While one can argue that everything is foreseeable, we hold as a matter of law that plaintiff's presence within the pumphouse balcony was not foreseeable in this case. Thus, the only duty that defendant owed plaintiff under the facts of this case was the duty to refrain from wilful and wanton misconduct.

## D. Wilful and Wanton Misconduct

■ In *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, 69 N.E.2d 293, 300, the Illinois Supreme Court defined wilful and wanton misconduct as a reckless disregard for the safety of others after knowledge of impending danger:

> "A wilful or wanton injury must have been *** committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care."

The court reaffirmed this rule in *Hering v. Hilton* (1958), 12 Ill. 2d 559, 564, 147 N.E.2d 311, 315: "[I]t is sufficient if [the defendant] had notice which would alert a reasonable man that substantial danger was involved, and that [the defendant] failed to take reasonable precautions under the circumstances." See also *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 412 N.E.2d 447; *O'Brien v. Township High School District 214* (1980), 83 Ill. 2d 462, 415 N.E.2d 1015; *Klatt v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 481, 211 N.E.2d 720; *Templar v. Decatur*

*Public School District No. 61* (1989), 182 Ill. App. 3d 507, 538 N.E.2d 195; *Hadley v. Witt Unit School District 66* (1984), 123 Ill. App. 3d 19, 462 N.E.2d 877; *Skinner v. Mahomet Seymour School District No. 3* (1980), 90 Ill. App. 3d 655, 413 N.E.2d 507.

In applying this definition of wilful and wanton misconduct to the facts of this case, we find that there is simply no support for plaintiff's contention that defendant acted wilfully or wantonly to injure trespassers to its pumphouse balcony. Several witnesses testified that the pumphouse was very safe because the elevated wires in the enclosed balcony had been made inaccessible to all but authorized personnel—the front door of the pumphouse was locked, the transformers were enclosed in a steel shroud 13 feet above the ground, the only entrance to the balcony was through a 12- by 20-inch gap in its floor, and the ladder used to reach this entrance was kept behind a locked door. That no warning signs were posted or fences maintained is of little consequence because defendant was unaware the pumphouse balcony posed a risk under these circumstances. Accordingly, we find that the evidence presented at trial does not support a verdict that the defendant, or its agents, acted wilfully or wantonly.

Because a party is entitled to a judgment *n.o.v.* when the evidence, viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14), we reverse the trial court's denial of defendant's motion for a judgment *n.o.v.*

Because we find that defendant did not breach its duty to plaintiff, we need not address the other issues defendant has raised on appeal, namely, the issues pertaining to the award of punitive damages or the admission or exclusion of certain evidence.

Reversed.

GREEN and KNECHT, JJ., concur.